[Civ. No. 6765. Second Appellate District, Division Two.—May 11, 1931.]

MATHILDA PEPPERCORN, a Minor, etc., Appellant, v. GEORGE STEWART et al., Respondents.

Floyd S. Sisk for Appellant.

Gibson, Dunn & Crutcher, Norman S. Sterry, W. I. Gilbert and Philip C. Sterry for Respondents.

THOMPSON (IRA F.), J.—This is an appeal from a judgment of nonsuit in an action against defendants, who are physicians and surgeons, for malpractice. On April 23, 1923, the plaintiff, a child of five years at the time, broke her arm at the elbow, that is to say, in the language of the physician, she suffered a fracture of the upper end of the ulna and a dislocation of the head of the radius, and was taken to respondents for treatment. The only testimony in the record shows that the first thing done "was to reduce the dislocation and fracture" and apply splints. On the following day, according to appellant's mother, April 24th the respondents took an X-ray, although, ac-

cording to one of the respondents, it was taken on the day of the injury. On April 26th additional X-rays were taken for the purpose of determining whether the apposition of the bones was good and whether the head of. the radius was in place. Various others were taken until some time in June. The splints were worn for a period of about six weeks. Thereafter for a period of time, which is uncertain because the witnesses did not agree, she wore an iron brace. The mother of plaintiff said it was six weeks, the father made no mention of the brace, the sister thought it was two or three weeks and Dr. Sheller, that the arm was in splints of various types from April 23d, to August 28th. The respondents were discharged on the last-mentioned date and Dr. Stewart employed on September 9, 1926. Dr. Stewart described appellant's condition at the time as follows: ''The arm was at about a right angle, and the forearm . . . was very badly abraded with whatever bandages or traction or whatever it was she had on prior to the time she came to us. That is, I mean there were sores on the arm at various places. Those sores were of such a nature that it was impossible to at the time continue further treatment. We had to wait until the sores were healed. The arm was badly deformed.'' X-rays were then introduced to show the situation and the doctor continued in effect to say that the photographs disclosed a fracture of the ulna about three inches below the joint with a jog, around which nature had placed ''an immense amount of callous'' and the radius was dislocated forward. Two further items of testimony must be set down. The father of the appellant testified that he took her to the office of the respondents on two occasions, the first about two weeks after the injury and the second in about six weeks. On the second occasion he said that they had ''her arm tied up so tight she couldn't bend it—she couldn't move it'' and so he asked them what was wrong. He further testified that they opened the bandages and to use his own language ''they found that the arm was stiff, saw the arm was stiff, and they tried to straighten it out or bend it so she could move it. Mr. Murphy held it right here, and Mr. Sheller commenced to hold it here and bend it sideways, and this way, and broke the arm back and forth; so once I heard the arm crack. The arm was cracking. I heard a cracking noise. I said, 'You made a bad job this

time'; . . .'' The mother testified as follows: "When I paid the bill, Dr. Sheller says to me, there in the hall—I says, 'Doctor, you never fixed that arm. The arm is not right.' He says: 'Well it is best I could do'; and he says, 'That is why I just charged you $25.00 for the doctor bill, because I know that she got a [im]perfect arm' he said; that conversation occurred some time in June or July of 1926. . . . He didn't do anything then. He told me to take her home and let the sores and things on her arm heal and then bring her back again."

The first question with which we are concerned is whether the evidence was sufficient, as appellant contends, to have warranted the case being submitted to the jury. Before the question may be answered it is essential to have in mind the rules of law applicable to such actions. There are two quotations to be made from *Perkins* v. *Trueblood,* 180 Cal. 437 [181 Pac. 642], which succinctly state the law. The first is as follows: "It is true that there is some evidence which tends to show that at the time of the fall and the second fracture the ends of the broken bone overlapped nearly one-half of an inch, and that there was no complete bony union prior to the treatment of another physician for the final fracture resulting from the fall. In the absence, however, of a showing that such a condition would have been at least improbable had the leg received reasonably prudent and ordinarily skillful surgical treatment, it cannot be said that the mere pathological condition of the leg in and of itself suffices to show negligence on the part of the defendant in resetting the leg. 'The difficulties and uncertainties in the practice of medicine and surgery are such that no practitioner can be required to guarantee results and all the law demands is that he bring and apply to the case in hand that degree of skill, care, knowledge and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances.' (*Zoterell* v. *Repp,* 187 Mich. 330 [153 N. W. 695].)"

The second reads: "In *McGraw* v. *Kerr,* 23 Colo. App. 163 [128 Pac. 873], it is said: 'Negligence on the part of a physician consists in his doing something which he should not have done, or in omitting to do something which he should have done.' Quoting further from the same case:

'The authorities are practically uniform in holding, . . . that as to what is or is not proper practice in examination and treatment or the usual practice and treatment, is a question for experts, and can be established only by their testimony.' '' In *Houghton* v. *Dickson,* 29 Cal. App. 321 [155 Pac. 128], we have a situation very similar to the one here. In the cited case the ulna of plaintiff's right arm was broken and he placed himself in the care of the defendant, a physician. It was alleged that the defendant was guilty of negligence ''not only upon the alleged fact that in setting and treating the fracture there was a lack of care and skill by reason of which the fractured bone failed to unite, but that the bone known as the radius was at the time or at a later date during the treatment dislocated at the elbow, which fact defendant, by reason of his failure to exercise ordinary care and skill, failed, to discover or properly treat.'' The court then said: ''While plaintiff by his evidence shows in detail just what defendant did in operating upon the arm and in the treatment thereof while under his professional care, he produced no evidence tending to prove that defendant, either in performing the operation or treatment administered thereafter, was guilty of negligence. The condition of the arm on March 29 (two months and four days after the injury)—that is, the dislocation of the radius; the fact that the wire intended to retain in place the fractured bones had broken; failure of the fractured bones to unite, and suppuration of the wound—was not, in the absence of other proof, sufficient evidence that there had been a want of ordinary care and skill on the part of defendant in treating plaintiff's injuries.'' Again the court says: ''Indeed, from aught that appears to the contrary, the dislocation might have been caused by the enfeebled condition of the muscles and ligaments following continued nonuse of the arm and the carrying of it bandaged and in splints. But assuming that it was dislocated at the time when defendant undertook the treatment of the fractured bone, or that it occurred thereafter during the treatment, such fact alone does not show that defendant was lacking in ordinary care and skill in not discovering such condition. . . . Whether or not defendant should, under the circumstances, in the exercise of ordinary and reasonable care and skill, have discovered such condition, assuming it to

have existed, was a question for expert testimony, and none was offered." It is also pointed out in the same opinion that a surgeon does not undertake to perform a cure nor does he contract to use the highest possible degree of care, but that he will use ordinary care and skill as tested by the practice of reputable members of his profession in his community. And still further that: "In the absence of evidence to the contrary, the law will presume the exercise of a reasonable degree of care and skill." It is not difficult to make application of these principles to the instant cause. No expert testimony was introduced to show that respondents either failed to do something which they should have done or did something which they should not have done when measured by the standards of their profession. In fact, the testimony was most meager concerning what they actually did. When called under section 2055 of the Code of Civil Procedure one of the respondents testified that they reduced the fracture and the dislocation. The record does not even disclose the kind of a fracture suffered by the plaintiff whether simple, compound, or comminuted, oblique, transverse or lateral. There is nothing from which we can infer that the radius was dislocated on August 28th, or the cause of a dislocation after it was reduced by the respondents at the first treatment. As suggested in the case of *Houghton* v. *Dickson, supra,* it may have become redislocated by reason of its nonuse and the weakened condition of the muscles and ligaments. Much stress is laid by counsel upon the testimony of the girl's father to the effect that the respondents took hold of the arm, bending it back and forth until he heard it crack. It was a simple matter to have produced testimony to show whether such acts were proper or improper. Manipulation to prevent and reduce stiffness in such cases is a common practice, but the author of this opinion cannot in the absence of expert testimony say how much force should be used or when, or prescribe any of the technical features thereof. We are left wholly to conjecture as to what the cracking noise was. There is no testimony of a second fracture—yet it seems hardly conceivable that crepitation might have been heard by the untrained ear—nor do we have anything to guide us to determine whether a dislocation might have been heard. If we were to indulge in speculation and in our own limited

knowledge of the situation, connected with testimoney that there was in September an undue amount of callous around the fracture and that the arm was stiff, we should say that the cracking noise was caused by the breaking away of some calcification which had reached over into the joint, in which event our speculation would be that experts would approve the treatment. Appellant places great reliance upon the case of *Dameron* v. *Ansbrod,* 39 Cal. App. 289 [178 Pac. 874], and particularly to portions thereof which are construed by them to mean that expert testimony is not essential to establish negligence in a case of this character. What is there said, however, is as follows: "As to the nature of the treatment required and the amount of force that might be exercised to break such adhesions as existed in this case, manifestly only an expert could properly determine and testify. But the instruction was faulty as implying that only an expert could testify as to the amount of force that actually *was used* and the method of treatment that was actually employed. As to what occurred, of course, the non-expert was as competent as the expert witness. If there had been no dispute as to the facts it would have been a question solely for the physicians and surgeons." This language is clear. It means that the lay person may testify concerning things which were actually performed, but that as to the propriety of those things the expert is the only legitimate witness. ■ Considerable emphasis is also placed upon the testimony of the guardian *ad litem,* Mrs. Peppercorn, in which she said one of the respondents told her that the reason they charged her only $25 was because they knew that Mathilda, the minor, did not have a perfect arm. But this, while constituting an admission as to results, gives us no enlightenment concerning the cause. We may remark incidentally that therein lies the major error of the appellant's counsel. He assumes that we can, or that the jury could, reason from results to a cause without further information concerning the cause. There is no doubt that appellant had a serious condition in her arm as late as October 14, 1926, when the operation was performed by Dr. Stewart, but the record is silent concerning the reason for this situation.

■ Counsel has recited 23 different assignments of error in the rejection of testimony, but in 19 instances at least we

are supplied with no argument or authorities to support the statement that the court committed error. Under a well-known rule we are not required or expected to make an examination thereof in an effort to find possible grounds for a reversal. That is the business and responsibility of counsel.

The other four assignments are so closely related to the general discussion and rules of law already announced that it is not profitable or necessary to indulge in extended comment. For example, Dr. Stewart was asked to state whether ordinary care had been used by respondents, without submitting to him through the question a single thing they had done or not done. He was also asked as to the length of time a fracture of the kind should take to heal, without any qualifications. Patently, the foundation was not laid for an opinion on either subject. The other two assignments proceed upon the theory that without the advice of experts the jury should reason from an unsatisfactory result to the conclusion that there was negligent treatment.

Lastly, it is said that because the respondents pleaded that if there was any injury and damage sustained by the appellant that they were directly contributed to by the fault, carelessness and negligence of the plaintiff herself, it should be held that the respondents admitted their negligence. Without quoting at length from the opinion it may be said that the case of *Hoffman* v. *Southern Pac. Co.*, 84 Cal. App. 337 [258 Pac. 397], at page 347, answers appellant's contention completely, clearly and conclusively.

Judgment affirmed.

Works, P. J., and Craig, J., concurred.