502 So.2d 626 (1987)
Deborah Lynn HICKOX, a Minor, By and Through Her Father and Next Friend and Guardian, Henry B. HICKOX, Separately and Severally
v.
Boyce HOLLEMAN, Individually, Boyce Holleman, a Professional Association; Philip Weinberg, Separately and Severally.
No. 56004.
Supreme Court of Mississippi.
January 21, 1987.
Rehearing Denied March 4, 1987.
*628 James W. Nobles, Jackson, Robert T. Cunningham, Donald Richard Bounds, Mobile, Ala., for appellant.
Jerry O. Terry, Greaves, Terry, Sheely & Holder, Gulfport, for appellee.
Before HAWKINS, P.J., and PRATHER and ROBERTSON, JJ.
HAWKINS, Presiding Justice, for the Court:
Deborah Lynn Hickox and her father Henry B. Hickox appeal from a judgment of the circuit court of the First Judicial District of Harrison County sustaining a motion for a directed verdict and dismissing their legal malpractice suit against Boyce Holleman and Philip Weinberg individually, and Boyce Holleman, a professional association.
The circuit judge sustained the motion first, because there was no proof of a deviation in the proper standard of care by treating physicians of Deborah (Debbie) in New York, and second, that the statute of limitations had run against the plaintiffs barring a suit against the United States Government under the Federal Tort Claims Act before they ever retained the legal services of these defendants.
In the posture of this appeal, under the familiar guidelines stated herein, we consider all of the credible evidence in the case in the light most favorable to the plaintiff and indulge all reasonable inferences which will support plaintiffs' cause. See Smith v. Estate of Gilbert, 498 So.2d 823 (Miss. 1986); Evans v. Journeay, 488 So.2d 797, 799 (Miss. 1986); White v. Hancock Bank, 477 So.2d 265, 269 (Miss. 1985); Edwards v. Cleveland Foods, Inc., 437 So.2d 56, 58 (Miss. 1983).
Because the circuit court erred in excluding opinion testimony from a medical expert, we reverse.

FACTS
Debbie was born April 9, 1972, the third child of Henry B. and Claudine Hickox. Henry was in the United States Navy, stationed at Hempstead, New York, as a recruiter. The United States Naval Hospital at St. Albans (called St. Albans) was approximately twenty miles away. At the end of November, 1972, Debbie became ill with a high fever and sick to her stomach. On December 2 her parents took her to the pediatric clinic at St. Albans. Both parents testified they had first taken her to the hospital in November, but the records produced showed no visit prior to December 2.[1]
On the December 2 visit the attendants checked Debbie's temperature, her ears, nose and throat. The attendants prescribed Tylenol and lots of liquid, and told the parents to sponge bathe Debbie when her temperature got high. Her condition did not improve following this visit, so the parents called the hospital, and eventually brought Debbie back to the clinic on December 6. She was again examined and the same treatment prescribed.
Debbie's condition did not improve. Her parents thought she was getting worse, so they again returned to the hospital on December 15. At this visit the hospital performed *629 a spinal puncture which revealed Debbie had bacterial meningitis.
Debbie's final diagnosis was haemophilis influenza meningitis, with resultant permanent brain damage. She was hospitalized until January 5, 1973.
Her parents returned her to St. Albans on January 6, 1973, where she remained hospitalized until January 12. When the hospital discharged Debbie, they told the Hickoxes that Debbie suffered from hydrocephalus, post hemophilus influenza meningitis.[2]
Until November, 1972, Debbie was a healthy baby. Her disease caused permanent brain damage, whereby she became little more than a vegetable, totally dependent on others for her care and feeding. She could not speak, her excretions were controlled by diaper, she had to be spoon fed, and could not move her arms or legs. At eleven years of age, she weighed approximately forty pounds, and was four feet tall.
Henry retired from the Navy in May, 1974, and moved to Jackson County. According to Henry and Claudine, in the latter part of November, 1974, they both went to Holleman's office in reference to employing him for any claim they had for medical malpractice.
Holleman referred them to Weinberg, an associate in the firm, who interviewed them. The Hickoxes gave Weinberg Debbie's medical records, discussed their claim with him, and orally agreed to employ the firm for a one-third contingency fee.[3]
Hickox testified they heard nothing from Weinberg, so they returned to his office in April, 1975. Then Weinberg told them he had lost his notes. Weinberg interviewed Mr. Hickox again and took more notes.
The Hickoxes made two or three inquiries following this visit. Each time the firm reassured them, but on July 6, 1976, Ben Galloway, in Holleman's firm, wrote Claudine that Weinberg had left the firm and that Claudine should contact him about Debbie's case.
The Hickoxes became dissatisfied with this representation, and on some later date got their file from the Holleman law firm. On June 14, 1977, they employed J. Allan Sadler of the law firm of Bailey and Sadler in Ocean Springs to represent them. The same day the chancery court of Jackson County appointed Hickox legal guardian of Debbie and authorized him to file suit on her behalf.
On February 2, 1979, Debbie through her father, and Henry individually filed a complaint in the United States district court for the Southern District of Mississippi against the United States under 28 U.S.C. § 1346(b), the Federal Tort Claims Act. As to Debbie's medical history and the events following, the complaint alleged the facts above related, except no allegation was made that she had been taken to St. Albans prior to December 2, 1972. The complaint demanded $1,250,000 damages for Debbie, and $250,000 for Henry. The Hickoxes propounded interrogatories to the Government, asking the names and addresses of treating physicians and nurses, and for detailed facts as to her examination and treatment. The Government objected to answering the interrogatories, because the complaint on its face showed the cause was barred by 28 U.S.C. § 2401(b), since it had not been presented to any appropriate government agency within two years from *630 the time her claim arose, the plaintiff having first corresponded with the U.S. Navy on August 30, 1979. Even so, the Government filed an answer to the complaint, alleging as its first defense the claim was barred by the two-year limitation of 28 U.S.C. § 2401(b).
The answer admitted Debbie was a patient and received treatment in the emergency room at St. Albans on December 2, 1972, and stated affirmatively that on December 6 the pediatric clinic at St. Albans treated her, with Debbie having a history of fever running 103-104 degrees for a week, recurring vomiting and diarrhea for three days. The answer also alleged a physician diagnosed Debbie on that date with viral syndrome. The answer also admitted that the hospital admitted Debbie on December 15, took a spinal puncture test, and made a diagnosis of bacterial meningitis. The answer admitted that all physicians who saw Debbie were government employees.
On January 2, 1980, the Government filed a motion to dismiss because the claim was barred under 28 U.S.C. § 2401(b). The Government attached as an exhibit to this motion what was alleged to be everything in writing that it had received from the Hickoxes prior to filing the complaint. Among the papers in this exhibit was a dim photostatic copy of the narrative summary of Debbie's hospital record on December 15, 1972, consisting of two pages. The names of the doctors signing this summary are not legible.
On January 10, 1980, an order dismissing the case was entered, because of the failure to present a claim within two years as required by the federal statute.
The above record of the federal court proceedings was offered into evidence as Exhibit 3 to the plaintiffs' case for the trial of this cause.
This suit was brought on August 19, 1980, against Holleman and Weinberg individually, and the Boyce Holleman professional association in the circuit court of Harrison County, alleging legal malpractice. Debbie sued through her father as guardian and next friend claiming damages of $3,000,000 and Hickox also sued in his individual capacity for loss of his right against the government claiming damages of $500,000.
The Hickoxes asserted the Holleman firm negligently failed to file a claim within two years from its accrual as required under Title 28 U.S.Code Ann. § 2401(b). The Hickoxes asserted that the defendants were liable because their negligence caused Debbie to lose her right to pursue a meritorious medical negligence claim against the government.
Prior to trial the circuit judge excluded the St. Albans medical records which the plaintiffs proposed to offer into evidence.
Henry and Claudine were the first witnesses, who testified as above set forth.
Terry B. Carle, M.D., a specialist in physical medicine and rehabilitation, who examined Debbie in July, 1983, testified about her condition and gave his prognosis that she would be totally incapacitated for her life, due to the infectious encephalitis or meningitis.
Following the Hickoxes' move to Jackson County, Debbie was periodically taken to the medical center at Keesler Air Force Base for medical attention and treatment. The director of patient affairs and custodian of the medical center's records, Capt. Terry McCullough, pursuant to a subpoena, produced all the Keesler Air Force Base medical center's records pertaining to Debbie. In those records were what purported to be some of her medical records from St. Albans. Among these were the photostatic copy of notes made at a December 2 and a December 6, 1972, out-patient visit by some individuals who examined some patient on those dates (Debbie's name is not on them), and photostatic copies of the narrative summary of her clinical record in her December 15, 1972-January 5, 1973, hospitalization, and the narrative summary of her clinical record in her January 6-January 12, 1973, hospitalization. The December 2 and December 6, 1972, notes are handwritten, using medical terms and abbreviations, *631 with some of the writing quite dim. We cannot from this record determine with any assurance of accuracy the full meaning of these notes. The narrative summaries are typed and legible.
The court sustained the defendants' objection to admission of the record evidence of Debbie's examination and treatment at St. Alban's.[4]
David Leon Dugger, M.D., a pediatrician stationed at Keesler Air Force Base, first saw and treated Debbie in 1974. He described bacterial spinal meningitis as a common disease and claimed every medical student learns how to diagnose it. He added the meninges is a membrane covering of the brain, and when it becomes infected, unless treated promptly the germs will eat into the membrane and brain, causing permanent brain damage. He stated spinal meningitis is a common disease among children.
Dr. Dugger said the conditions related by the Hickoxes on December 2 through December 6 created an extremely high level of suspicion, indicating a need on December 6 for a spinal tap and examination of the spinal fluid to determine the presence of the germs which cause spinal meningitis. He said this test could be performed by a physician in 2-3 minutes, and its results would be known in just five minutes.
Dr. Dugger was asked if he knew whether the standard for the diagnosis and treatment of meningitis was different in one part of the country from another. He replied the standard was the same. The Hickoxes' attorney then asked him the following question:
Q. I will ask you then whether, based on your training, your education and your experience on the subject of meningitis, do you have an opinion, which you can state with a reasonable degree of medical certainty, whether or not there is a minimum standard of medical care that would apply to any licensed Physician, with regard to the diagnosis of meningitis.
Vol. IX, p. 1132.
The circuit judge sustained the defense objection to this question.
Following a considerable skirmish, the circuit judge reversed his ruling, and allowed the Hickoxes' attorney to ask Dr. Dugger the following hypothetical question: Assuming that Debbie was born April 9, 1972, developed normally and was able to sit up and crawl in late November of that year when she developed a fever and intermittent vomiting, was taken to the pediatric clinic at St. Albans, was seen by a physician and a history taken, and that after being sent home her parents gave her cool sponge baths and Tylenol, but she continued with the same symptoms, with her fever running from 101 to 104 degrees, that her parents returned her to the hospital clinic on December 2, where she was again seen by a physician, a history taken, and Debbie sent home, that the same treatment was continued and she had the same symptoms with diarrhea, that her parents returned to the hospital clinic on December 6, and no spinal tap was performed, that after this last visit her symptoms continued, and on December 15 her condition had gotten worse, she was returned to the hospital, and was hospitalized; and that on December 16 Debbie had seizures, a fixed gaze and spasticity in her limbs, which condition continued, and that Debbie's present condition was that of a spastic quadriplegic with severe brain damage and motor retardation. The question concluded as follows:
Q. Now, assuming those facts to be true, and based on your medical education, *632 your training, your experience, your care and treatment of Debbie Hickox, do you have an opinion, which you can state with a reasonable degree of medical certainty, as to the cause of Debbie's brain damage?
A. Yes, I do.
Q. And what is that opinion?
A. My opinion is that she did not receive appropriate medical care at the December 6 visit and between that point in time and December the 15th.
Q. All right, sir
Vol. IX, p. 1176.[5]
The defense objected that the doctor had not responded to the question posed. The circuit judge sustained the objection, but he allowed the doctor to testify that Debbie's brain damage had been caused by the presence of meningitis. The judge also permitted the doctor to testify that Debbie's condition was brought about by bacterial meningitis, caused by haemophilous influenzae, a particular bacteria. (Vol. IX, p. 1187) (Dr. Dugger explained in another part of his testimony that bacterial meningitis had nothing to do with ordinary influenza, that the two diseases were entirely different.)
Despite the circuit judge's ruling, he permitted the plaintiff to ask Dr. Dugger whether he thought a spinal tap should have been performed on Debbie on December 6, 1972. Dr. Dugger responded that a tap definitely should have been performed, because Debbie's symptom revealed an extremely high index of suspicion of meningitis.
The court also permitted Dr. Dugger to state that had a spinal tap been performed on December 6, 1972, in his opinion it definitely would have revealed spinal meningitis.
The doctor was not permitted to testify that if a spinal tap had revealed the bacteria, whether this would have prevented Debbie's brain damage. The trial court sustained the objection to this question.
Because Dr. Dugger was not personally familiar with the standard of treatment by physicians in New York, the Court did not allow him to specifically give an opinion of whether Debbie had been properly treated. (Vol. X, p. 1214)
However, following Dr. Dugger's cross-examination, on redirect, the circuit judge permitted him to testify that in his opinion a spinal tap on December 5 would have been positive, and if Debbie had received antibiotic treatment on that date, she would not have been brain damaged. He testified that antibiotic therapy should be instituted as soon as possible. Dr. Dugger testified that he had never had a patient to end up like Debbie.
Also on redirect examination plaintiffs' counsel asked Dr. Dugger to read from the December 15 narrative summary from plaintiffs' Exhibit 3. He responded:
History of present illness. This was the first St. Albans Naval Hospital admission for this eight month old white female, who had had a history of vomiting and diarrhea, with intermittent fever, for thirteen days, prior to admission.
The doctor was then asked what was the usual course of time for a virus to cause sickness. He replied that the sickness lasts two or three days then dissipates. Next, he was asked if a physician expects virus, but it lasts beyond the two or three day course and continues five to ten days, should the physician suspect more than just a virus. The Court sustained the objection to this question.
The Court also sustained the objection to the question of whether a doctor should suspect more than a virus when a child has fever, vomiting and diarrhea more than two or three days. The doctor was permitted to testify, however, that the usual course of a virus did not extend ten to twelve days.
The plaintiffs' next witness was Valentino D.B. Mazzia, M.D., an anesthesiologist. Dr. Mazzia also specialized in and had done *633 research in complications and death, associated with surgical, anesthetic, diagnostic and therapeutic procedures. He taught in medical schools in several states, and practiced in New York.
Dr. Mazzia had never seen or treated Debbie. He gave a thorough explanation of the human anatomy, the brain and spinal cord, and how bacteria caused spinal meningitis. He noted the vital importance of doing a spinal tap when the patient's history and examination gives the physician reason to suspect the presence of the bacteria. He also testified that the procedure for examination and diagnosis of meningitis was the same in New York as elsewhere else, and that every medical school graduate was thoroughly schooled in these procedures.
Dr. Mazzia gave no opinion, however, of the specific diagnosis, care and treatment indicated in Debbie's case.[6]
Finally, the plaintiff called Weinberg as an adverse witness. He admitted he did not research the statute of limitations applicable to the Federal Tort Claims Act. He simply assumed because Debbie was a minor, no statute of limitations problem presented itself, and claimed that he was taught that in law school. He conceded the importance of checking for the applicable statute of limitations in any case as it applied to the facts, but said he was overloaded and spent little time on this case.
The plaintiffs then rested.
Upon the defendants' motion for a directed verdict, the circuit judge ruled:
The Court having heard the Motion and argument of Counsel for both sides and having heard the evidence presented to this point, which is the point at which the Plaintiff has rested, and the Court considering this Motion for a Directed Verdict, must take the evidence adduced by the Plaintiff, prior to his resting, as most favorably in view of the Plaintiff. And in doing so, the court finds that the Plaintiff Deborah Hickox was a patient at St. Albans Naval Hospital on Long Island, beginning in November of 1972. That the Plaintiff has adduced here evidence from the parents of the child as to certain treatment that was given to the child; has adduced evidence from two experts as to the causal relation of the symptoms and as to the standard of care required.
The Court finds, in reviewing this evidence most favorably and for the Plaintiff, that there is no positive evidence in this case, in this record, which would show a deviation from the standard of care.
There is evidence that these Physicians would have performed their duties otherwise.
But the actions attributed to these Doctors, by the parents, who saw them, and that being the only record in this case of what transpired there, as far as these Physicians are concerned, all of those actions were in conformity with the standard of care. And there being no other record, the matter would be one of speculation for the Jury.
The court also finds that from the evidence in this case that the cause of action accrued when the parent discovered the defects in this child caused by meningitis. And, therefore, the statute began to run at that time.
And the Motion for a Directed Verdict is sustained.
Vol. XI, pp. 1528-1530.

LAW
This is a legal malpractice case. To recover in such a case in this state, it is incumbent upon the plaintiff to prove by a preponderance of evidence the following:
1. Existence of a lawyer-client relationship.
2. Negligence on the part of the lawyer in handling his client's affairs entrusted to him; and
3. Proximate cause of injury.
*634 In this case there is no dispute that a lawyer-client relationship existed between the plaintiffs and the defendants following the first visit to the Holleman office. There is a sharp dispute when this first visit occurred, however.
As to the second factor, a lawyer owes his client the duty to exercise the knowledge, skill, and ability ordinarily possessed and exercised by the members of the legal profession similarly situated. Failure to do so constitutes negligent conduct on the part of the lawyer.
As to the third essential ingredient, the plaintiff must show that but for their attorney's negligence, they would have been successful in the prosecution or defense of the underlying action. See: Thompson v. Erving's Hatcheries, Inc., 186 So.2d 756 (Miss. 1966); Nause v. Goldman, 321 So.2d 304 (Miss. 1975). In Thompson v. Erving's Hatcheries, Inc., infra, page 759, quoting with approval 7 Am.Jur.2d Attorneys at Law, § 188 at 156 (1963), this Court stated:
In an action against an attorney for negligence or violation of duty, the client has the burden of proving the existence of the relation of attorney and client, the acts constituting the alleged negligence, that the negligence was the proximate cause of the injury, and the fact and extent of the injury alleged. The last element mentioned often involves the burden of showing that, but for the negligence of the attorney, the client would have been successful in the prosecution or defense of an action.
In the context of the present action, the plaintiff/client carries this burden by trying the underlying medical malpractice claim as a part of this legal malpractice case, not by trying to prove or recreate what would or may have happened in some other court at some other time and place. More specifically, the "success" component of plaintiff's burden involves no attempt to show what would have happened if the Holleman firm had timely brought the Federal Tort Claims Act case. Rather, the issues that would have been tried there are made up and tried in the legal malpractice suit as the first step in plaintiff's claim here.
Any cause of action the Hickoxes had against the United States is based upon 28 U.S.C. § 1346(b) of the Federal Tort Claims Act:
§ 1346. United States as Defendant
* * * * * *
(b) Subject to the provision of chapter 171 of this title, the district courts, ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
The time for bringing any such action is limited by 28 U.S.C. § 2401(b):
§ 2401. Time for commencing action against United States
(b) a tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

THE DIRECTED VERDICT
The plaintiffs first argue that the circuit judge erred in directing a verdict in favor of the defendants. To decide this point, we consider not only the reasons given by the circuit judge in his ruling, but also the reasons given by the defendants to support the correctness of any such ruling. The plaintiffs' argue that we are restricted to the reasons the trial court gave for directing a verdict, namely: The uncontradicted evidence showed the two-year statute had *635 run when the defendants were employed, and also that the plaintiffs failed to show medical malpractice under New York standards.
The defendants on the other hand argue that we should consider other reasons urged by them in support of their motion for the directed verdict, namely: The action against the defendants was barred by Miss. Code Ann. § 15-1-29, this State's three-year statute of limitations on oral contracts, especially since it was pleaded in an affirmative defense without denial by the plaintiffs, Miss. Code Ann. § 11-7-59; and, finally the plaintiffs offered no expert to testify as to legal malpractice on the part of the defendants.
In making this argument, plaintiffs misconstrue the function of an appellate court. Appellate courts are not in the business of reversing a trial court when it has made a correct ruling or decision. We are first interested in the result of the decision, and if it is correct we are not concerned with the route  straight path or detour  which the trial court took to get there. See: Allgood v. Bradford, 473 So.2d 402, 411 (Miss. 1985); Briggs v. Benjamin, 467 So.2d 932, 934 (Miss. 1985); Tedford v. Dempsey, 437 So.2d 410, 418 (Miss. 1983); Huffman v. Griffin, 337 So.2d 715, 723 (Miss. 1976); Lee v. Memphis Publishing Co., 195 Miss. 264, 14 So.2d 351, 353 (1943); Chatham v. Johnson, 195 So.2d 62 (Miss. 1967). An appellee is entitled to argue and rely upon any ground sufficient to sustain the judgment below. Ferguson v. Watkins, 448 So.2d 271, 275 (Miss. 1984).
As this Court stated in McCain v. Wade, 181 Miss. 664, 180 So. 748, 749 (1938): "The action of the trial judge is presumed to be correct, ..." and unless it is shown to be erroneous, our duty is to uphold it.
We must hold the erudite and experienced circuit judge erred when he held there was no proof the Hickoxes retained the services of the Holleman firm prior to the running of the two years' statute of limitations; Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 655 (Miss. 1975). On this appeal we will not address the issue of when the Hickoxes' claim became barred by 28 U.S.C. § 2401(b), although it appears the statute could not have expired before December 15, 1974. Henry and Claudine Hickox testified that they retained the law firm's services before that date. Upon retrial of this cause, we would suggest that the trial judge first determine as a matter of law when the two-year statute began, and when it expired on the Hickoxes' claim. Then he should consider written questions to the jury to enable them to determine when the Hickoxes retained the services of the Holleman firm. See: MRCP 49(b).[7]

PROOF OF LEGAL MALPRACTICE
The defendants argue that the plaintiffs failed to prove their legal malpractice case because they did not present an expert to testify whether the defendant attorney failed to exercise the standard of care required of a member of the legal profession. Ordinarily we would agree:
The generally accepted rule is that expert testimony is ordinarily necessary to support an action for malpractice of a professional man in those situations where special skills, knowledge, experience, learning or the like are required.
Dean v. Conn, 419 So.2d 148, 150 (Miss. 1982).
Yet this rule does not apply when the attorney's conduct is negligent as a matter of law and the plaintiff is entitled to a directed verdict on liability. In Thompson v. Erving's Hatcheries, Inc., supra, we held that the failure of an attorney to file a suit prior to expiration of the statute of limitations was negligence as a matter of law and the plaintiff in such case was entitled to a directed verdict on liability.
Even though the Thompson case involved a Mississippi statute of limitations *636 and the Hickoxes' claim fell under a Federal statute, Thompson applies here. Weinberg candidly admitted that he made no effort to check any law to determine the nature of the Hickoxes' claim. Weinberg should have at least done some research in order to properly represent the Hickoxes, especially since he was totally unfamiliar with the Federal Torts Claim Act and its statute of limitations. See Togstad v. Vesely, 291 N.W.2d 686 (Minn. 1980); Horne v. Peckham, 97 Cal. App.3d 404, 158 Cal. Rptr. 714, 721 (1979); Smith v. Lewis, 13 Cal.3d 349, 118 Cal. Rptr. 621, 627, 530 P.2d 589, 595 (1975). Since Weinberg failed to even open a book, we hold that he was negligent as a matter of law. Any such negligence, of course, is attributable to Boyce Holleman, A Professional Association, via respondeat superior.
As the New Mexico Court said in George v. Caton, 93 N.M. 370, 600 P.2d 822, 829 (App. 1979):
It does not require expert testimony to establish the negligence of an attorney who is ignorant of the applicable statute of limitations or who sits idly by and causes the client to lose the value of his claim for relief. An attorney who delays the bringing of an action until the statute of limitations has run is guilty of negligence if the attorney did not act solely with a view to promote the interest of his client. (citation omitted) Ignorance of statutes or rules of limitation of legal remedies can in itself justify a finding of culpable negligence.
See also Watkins v. Sheppard, 278 So.2d 890, 892 (La. Ct. App. 1973); Central Cab Co. v. Clarke, 259 Md. 542, 270 A.2d 662, 668 (1970).
Moreover, attorneys involved in malpractice actions must always remember there is a pragmatic difference between the trial of other professional malpractice cases and a legal malpractice case. In the former class, the lawyers and judges are laymen. In professional malpractice cases, excepting extreme cases, we rely upon experts for guidance. The attorney who finds himself the defendant in a legal malpractice case, however, has a judge and the trial attorneys who are already experts.

LIMITATION OF ACTION BAR AGAINST THE DEFENDANTS
We likewise find the contention that the Hickoxes' legal malpractice claim was barred by the three-year statute on all contracts, Miss.Code.Ann. § 15-1-29, as opposed to the general six-year statute on torts, Miss.Code.Ann. § 15-1-49, equally unpersuasive. Although the claim in this case arose by virtue of an oral contract, this cause of action is based upon the negligence of the attorney, and is governed by the six-year statute. Hutchinson v. Smith, 417 So.2d 926 (Miss. 1982). The defendants assert this is a pre-rules case, and they pleaded the three-year statute. Because of this and because of the plaintiffs' failure to respond to this claim, the defense argues that the three-year statute should govern. Under the pleadings in this case, it was not necessary for the plaintiffs to reply to defendants' plea. See: Guthrie v. Merchants Nat. Bank of Mobile, 254 Miss. 532, 180 So.2d 309 (1965); Anderson v. Laurel Oil Co. & Fertilizer Co., 228 Miss. 95, 87 So.2d 556 (1956). Moreover, there was never any factual issue upon which the three-year statute could have been predicated.
We do not find the grounds argued by the defendants to support the directed verdict meritorious.

PROOF OF MEDICAL MALPRACTICE
Now we return to the core issue: Was a jury issue made on medical malpractice?
Intertwined with this question are the other two assignments of error, namely, that the circuit judge erred in excluding the testimony by Dr. Dugger as to the standard of care required in New York, and the minimum training required to make a diagnosis of spinal meningitis.
The plaintiffs argue that sufficient evidence was presented  despite the circuit judge's ruling  to survive a motion for a directed verdict. We do not agree. On the *637 other hand, if the trial court erred in excluding admissible evidence and that evidence added to the evidence presented to the jury would have survived a motion for directed verdict, then we must reverse.
Since this case was tried, this Court in Hall v. Hilbun, 466 So.2d 856 (Miss. 1985), effectively abolished the "locality rule" insofar as determining whether a medical expert opinion should be admitted. The circuit court did not have the benefit of this decision. We must, therefore, hold that he erred when he used the "locality rule" to determine the admissibility of medical expert opinion. Under Hall v. Hilbun Dr. Dugger was qualified to testify as an expert on whether the St. Albans medical personnel committed medical malpractice in treating Debbie. The exclusion of that portion of his testimony on this basis of the "locality rule" was error. For this reason we must reverse. Undoubtedly, had the circuit judge admitted this testimony, he would not have entered a directed verdict for the defendants.
Serious questions remain, however, as to the competency of Dr. Dugger's opinion. This either was not brought out in the trial or was not addressed by the circuit judge. The admission of expert testimony is ordinarily addressed to the sound discretion of the trial judge. Alman Bros. Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc., 437 F.2d 1295 (5th Cir.1971); Dickerson v. Shepard Warner Elevator Co., 287 F.2d 255 (6th Cir.1961); Lehigh Portland Cement Co. v. Dobbins, 282 Ala. 513, 213 So.2d 246 (1968); Sovereign Camp W.O.W. v. Davis, 5 So.2d 480, 242 Ala. 235 (1941); Texas Emp. Ins. Ass'n v. Steadman, 415 S.W.2d 211 (Tex.Civ.App. 1967); 51 C.J.S. Evidence, § 551(2)(a) (1964). Because from this record we are unable to determine whether or not the trial court in the exercise of sound discretion would, or should have permitted Dr. Dugger's testimony in full, we review these problems now, and give guidelines for retrial.
The basic question, aside from Dr. Dugger's professional qualifications, is whether a proper or sufficient predicate was laid for him to express an expert opinion.
In the first place, the circuit judge was manifestly correct in excluding the portions of the St. Albans medical record, and indeed the plaintiffs do not argue the court erred in doing so. The trial record shows that upon the defendants' motion the circuit judge entered an order on January 14, 1984, excluding from evidence all the St. Albans records because they had not been certified as required by Miss. Code Ann. § 41-9-101-119, and excluded any statements made by Henry and Claudine to hospital personnel or statements made by the St. Albans physicians to the Hickoxes.
Also, as above noted, at the trial of the cause, plaintiffs sought to introduce the handwritten notes of December 2 and 6, and the narrative summaries of Debbie's hospitalization through the testimony of Capt. McCullough, the medical custodian at Keesler Air Force Base, and the court sustained the objection to their introduction. The circuit judge was correct because of the plaintiffs' failure to comply with Miss. Code Ann. § 41-9-109.
As we have noted, attached as part of the exhibit to the federal government's motion to dismiss the Hickoxes' Federal Tort Claim is what purports to be a narrative summary from the clinical record of the December 15, 1972, hospitalization, the first paragraph of which recites:
HISTORY OF PRESENT ILLNESS:
This was the first St. Albans Naval Hospital admission for this 8 month old white female, who had had a history of vomiting and diarrhea with intermittent fever for 13 days prior to admission. On admission the child was felt to have gastorenteritis with dehydration, but after several hours of hydration it became apparent that nuchal rigidity was present with a bulging anterior fontanelle. A lumbar puncture was performed and proved positive for bacterial meningitis.
This summary gives the discharge diagnosis of:

*638 1. Haemophilis influenza meningitis.
2. Oral and cutaneous candidiasis.
This photostatic copy, however, fails to show Debbie's name and was made an exhibit to the government's motion to dismiss, solely for the purpose of showing all the documents which had been filed with the government by plaintiffs' attorneys pursuing their Federal Tort Claims Act claim. There is nothing to show that this is in truth and in fact part of Debbie's hospital record at St. Albans.
Without proper foundation, none of the purported medical records pertaining to Debbie's medical treatment in St. Albans is competent evidence and should be excluded.[8]
Dr. Dugger as a treating physician at Keesler Air Force Base on doubt became quite familiar with the St. Albans records on medical file at Keesler. It is not clear whether his medical opinions totally excluded information contained in those records, or indeed if it was possible for him to do so. No opinion based in whole or in part on information contained in the St. Albans medical records should be admitted. Clark v. State, 409 So.2d 1325, 1328 (Miss. 1982); Entex, Inc. v. Rasberry, 355 So.2d 1102 (Miss. 1978); Spears v. State, 241 So.2d 148 (Miss. 1970); City of Laurel v. Upton, 253 Miss. 380, 175 So.2d 621 (1965); Wild v. Bass, 252 Miss. 615, 173 So.2d 647 (1965).
Furthermore, there is a serious question whether the hypothetical question contained sufficient factual information upon which Dr. Dugger could express an expert opinion. This was never addressed by the circuit court. The hypothetical question omits any medical diagnosis, omits tests leading to any diagnosis, and fails to indicate when, how, or if such tests were made. The hypothetical question in this case encompassed only the testimony of the parents, lay witnesses  a skimpy predicate at most to express an opinion on proper medical treatment. Clearly, no expert should be permitted to express an expert opinion on a hypothetical question which omits necessary facts, or fails to give a sufficient factual basis for the expert witness to express a valid opinion. See: Bennett v. Punton Sanitarium Ass'n., 213 Mo. App. 363, 249 S.W. 666, 672 (1923) (hypothetical must contain all pertinent history). Kale v. Douthitt, 274 F.2d 476, 482 (4th Cir.1960): "The facts upon which the expert bases his opinion or conclusion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture." Kruszewski v. Holz, 265 Md. 434, 290 A.2d 534, 540 (1972): "Of course, any assumption made must be grounded on a fair summation of the material facts in evidence and those material facts must be sufficient in scope, for the witness to formulate a rational opinion."
Also in McCraney v. Kuechenberg, 144 Ind. App. 629, 248 N.E.2d 171, 174 (1969), the Indiana Court noted:
Whether a witness' sources of information are sufficiently reliable to warrant reception of an opinion is for the trial court in the exercise of its discretion to determine and we hold that the admissibility of such opinion is necessarily dependent upon the laying of a proper factual predicate.
And, in Dean v. Carolina Coach Company, Inc., 287 N.C. 515, 215 S.E.2d 89, 91 (1975), the North Carolina Supreme Court stated:
As a general rule, a hypothetical question which omits any reference to a fact which goes to the essence of the case and therefore presents a state of facts so incomplete that an opinion based on it would be obviously unreliable is improper and the expert witness's answer will be excluded.
See also, Peppercorn v. Murphy, 114 Cal. App. 101, 299 P. 762 (1931); Jenson v. Findley, 17 Cal. App.2d 536, 62 P.2d 430, 435 (1972); In re Grahlman's Will, 248 Iowa 535, 81 N.W.2d 673, 681 (1957); Starr v. Oriole Cafeterias, 182 Md. 214, 34 A.2d 335, 336 (1943).
It therefore follows that any expert opinions by Dr. Dugger as to whether there *639 was proper medical treatment of Debbie by St. Albans personnel, must be based on sufficient competent evidence in the record before the jury to enable him to express an opinion. This can only be resolved by the trial judge on remand under the guidelines herein enunciated.
Although not assigned as error, we also note the trial court erred in sustaining defense objections to Dr. Dugger's opinions as to when a physician should expect a virus infection or something else in diagnosing a patient. He was competent to express such medical opinions. We make this observation to prevent this error recurring on retrial. We observe further, for purposes of the trial on remand, that the hypothetical question is by no means the only vehicle providing a legally sufficient foundation for an expert's opinion. See Rule 703, Mississippi Rules of Evidence, and comment thereto. Where feasible other means, such as having the expert witness sit in the courtroom and hear the testimony of foundation witnesses, are often superior to the hypothetical question.
REVERSED AND REMANDED.
ROY NOBLE LEE, P.J., DAN M. LEE, PRATHER, ROBERTSON and ANDERSON, JJ., concur.
WALKER, C.J., and SULLIVAN and GRIFFIN, JJ., not participating.
NOTES
[1] Also, in their suit against the United States, infra, their complaint made no allegations of Debbie being seen by any St. Albans' personnel before December 2, 1972.
[2] We note that the diagnosis and treatment of Debbie at the December 15, 1972, and January 6, 1973, hospitalizations as given come from what are purportedly portions of St. Albans medical records which are part of this record, but which the circuit judge excluded from being offered into evidence before the jury. We give this information solely for a more precise understanding of this infant's condition at the time, and do not in doing so vouch for its accuracy. For the reasons we will set forth in this opinion, the trial court correctly excluded these medical documents from being offered into evidence.
[3] Weinberg called as an adverse witness disputed the time the Hickoxes came, insisting it was in April, 1975, when they first arrived. On a pre-trial deposition, Holleman was equally positive the Hickoxes never came before April, 1975.
[4] However, as noted supra, a dim copy of the narrative summary of Debbie's December 15, 1972, hospitalization was in evidence as a part of plaintiff's Exhibit 3.

It should be further noted, however, that the very dim narrative summary contained in plaintiffs' exhibit 3 would leave some critical questions unanswered, one of which is the identity of the patient. Only by comparing the writing in Exhibit 3 to the narrative summary contained in the records produced by Captain McCullough can this Court know these two sheets are copies of the same original. The jury would not have had the benefit of this knowledge.
[5] The hypothetical never related a spinal tap being performed at the December 15 hospitalization, and never related what diagnosis was then made.
[6] At page 1337 of the record, plaintiffs' counsel stated that their only purpose in calling Dr. Mazzia as a witness was to testify to the standard of care in New York.
[7] A legal malpractice suit is in the nature of an indemnity action. Maryland Casualty Co. v. R.H. Lake Agency, Inc., 331 F. Supp. 574 (N.D. Miss. 1971), is an example of an indemnity case where special interrogatories to the jury were appropriately used.
[8] As indicated at trial, Vol. VII, pp. 980-990, the complete original St. Albans medical records may not presently exist. This does not change the correctness of the circuit judge's ruling.