# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-KA-00078-SCT

*MICHAEL NORTHUP a/k/a MICHAEL A. NORTHUP*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/1998 |
| TRIAL JUDGE: | HON. KEITH STARRETT |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | PAUL Mc GERALD LUCKETT |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEWITT T. ALLRED, III |
| DISTRICT ATTORNEY: | DUNN LAMPTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/06/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/27/2001 |

**BEFORE McRAE, P.J., DIAZ AND EASLEY, JJ.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Michael Northup ("Northup") was indicted by a Pike County grand jury on June 13, 1997, for the July 28, 1996,[1] murder of Odon Loper. A jury found Northup guilty of capital murder, and on March 27, 1998, the trial court sentenced Northup to a life sentence without parole. After a year's delay, Circuit Court Judge Keith Starrett allowed an out-of-time appeal in which Northup raises these four issues: 1) whether Northup was unduly prejudiced and received an unfair trial when the trial court allowed the State's expert witness to remain in the courtroom during a witness's testimony; 2) whether Northup's constitutional rights were violated when the State lost exculpatory evidence and/or whether Northup received a fair trial due to the loss of this exculpatory evidence; 3) whether the jury's verdict was against the overwhelming weight of the evidence; and 4) whether Northup was prejudiced and therefore received an unfair trial when the trial court abused its discretion in admitting a photograph into evidence.[2] Finding no error, we affirm the trial court.

## FACTS

¶2. Seventy-five-year-old Odon Loper (Loper), a retired barber, lived alone in a small house in McComb, Mississippi. His health was deteriorating, and he required the use of oxygen to breathe. Loper had no family, but he had friends whom he treated like family, including two of Northup's co-defendants, Diane Bryant ("Diane") and Chastity Pettrus (Chastity), Diane's first cousin.

¶3. Diane was married to James Bryant ("James") and was living in Bay St. Louis in 1996. While James worked offshore, Diane had an affair with Northup. In the summer of 1996, fifteen-year-old Chastity and her then boyfriend, nineteen-year-old Donnie Pettrus ("Donnie"), came to live with Diane.[3]

¶4. Loper often provided money to his friends, and both Chastity and Diane testified that Loper had often given them money and gifts. Diane stated that her relationship with Loper was like that of a granddaughter and that he bought her first vehicle for her and paid the down payment on her house. The two also testified that in the time prior to Loper's death, their relationships with Loper had deteriorated. Loper disapproved of Chastity and Diane dating people with racial backgrounds different from their own.

¶5. In July 1996, Diane, Chastity, Donnie, and Northup were in Diane's trailer drinking alcohol, and some were smoking crack cocaine. Diane had no money to purchase drugs, and she and the other three present began discussing killing Loper. After some discussion, Donnie and Northup agreed to rob and kill Loper.

¶6. On July 28, 1996, the four left Bay St. Louis and drove to McComb. Using two knives they brought from Northup's house, Donnie and Northup stabbed Loper, who had been in bed asleep, fifteen times and cut his throat. The two rummaged through the house but were only able to find twenty dollars.

¶7. A few months after Loper's death, Diane inherited approximately $37,000 to $40,000 from Loper. The murder of Loper remained unsolved.

¶8. In January 1998, police arrested James Stevens for some burglaries he had committed with Donnie, and he implicated Donnie in the Loper murder. When Donnie was confronted, he confessed and told police that both Northup and Diane were involved. Donnie pled guilty and was sentenced to life in prison. Diane also confessed, pled guilty and was sentenced to life in prison. Chastity pled guilty to accessory after the fact of capital murder and was sentenced to the RID program.

¶9. When Northup was arrested, a search of his trailer revealed a note, which was entitled "pepel to kill" and listed several names including James Bryant (Diane's husband) and Lori Blaylock, Chastity's step-mother. Diane, Chastity, and Donnie testified against Northup at trial.

## DISCUSSION

### I. WHETHER NORTHUP WAS UNDULY PREJUDICED AND RECEIVED AN UNFAIR TRIAL WHEN THE TRIAL COURT ALLOWED THE STATE'S EXPERT WITNESS TO REMAIN IN THE COURTROOM DURING A WITNESS'S TESTIMONY.

¶10. Northup invoked M.R.E. 615, the rule of sequestration, at the beginning of the trial. Prior to the State calling Donnie to the stand, it requested that pathologist, Dr. Steven Hayne ("Hayne"), be permitted to stay in the courtroom during Donnie's testimony. Northup objected, stating that Hayne's presence had not been shown to be essential, therefore it did not meet one of the exceptions to the rule. M.R.E. 615 allows a party to request the court to order witnesses excluded from the courtroom so that they may not hear the testimony of other witnesses.

¶11. The State argues that an expert may listen to other witnesses' testimony pursuant to M.R.E. 702 and 703, notwithstanding Rule 615. Rule 703, which allows an expert to base his testimony on facts made known to him "at or before the hearing," implies experts are not necessarily excluded from the courtroom via the rule of sequestration. There are two sources upon which an expert may base his opinion: "1) where the expert bases his opinion on personal observation and 2) where he bases it either on a hypothetical question presented to him at trial or on the trial testimony of others which the expert has heard while sitting in the courtroom." See M.R.E. 703 cmt. *Collins v. State*, 361 So. 2d 333, 334 (Miss. 1978), also

recognizes that an expert witness may be allowed to remain in the courtroom during the testimony of others. *Id.* (citing *Providence Washington Ins. Co. v. Weaver*, 242 Miss. 141, 152, 133 So. 2d 635, 639-40 (1961)).

¶12. Indeed, in *Hickox ex rel. Hickox v. Holleman*, 502 So.2d 626, 638 (Miss. 1987), this Court expressed a preference for the approved practice of having an expert base his opinion on testimony and evidence:

> We observe further, for purposes of the trial on remand, that the hypothetical question is by no means the only vehicle providing a legally sufficient foundation for an expert's opinion. See Rule 703, Mississippi Rules of Evidence and comment thereto. Where feasible other means, such as having the expert witness sit in the courtroom and hear the testimony of foundation witnesses, are often superior to the hypothetical question.

*See also* **McGilberry v. State**, 741 So.2d 894, 918 (Miss. 1999); **Gray v. State**, 728 So.2d 36, 56 (Miss. 1998).

¶13. The State argued that allowing Hayne to remain in the courtroom would be efficient in that it would eliminate proposing lengthy hypothetical questions to Hayne and lengthy repetition of the facts. The trial judge ruled that Hayne would be allowed to hear Donnie's testimony, as he stated, "[T]hat's the main reason for the witness remaining in the Courtroom, is to hear the predicate that you normally lay by use of a hypothetical question."

¶14. The trial judge allowed Hayne to testify as to the nature and cause of death and to the type of instrument used to kill Loper, but not as to the identification of the specific instrument used in the murder, since Donnie described the knives used in the murder during his testimony. The trial court did not err and is affirmed as to this issue.

### II. WHETHER NORTHUP'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE STATE LOST EXCULPATORY EVIDENCE AND/OR WHETHER NORTHUP RECEIVED A FAIR TRIAL DUE TO THE LOSS OF THIS EXCULPATORY EVIDENCE.

¶15. During the course of the trial, defense counsel stated that the State had made a tape recording of a conversation between Diane and Donnie at the Pike County Jail, some time in 1997, and that this conversation significantly impeached Donnie's trial testimony, making the tape exculpatory evidence. Neither the trial judge nor the State was aware that this tape existed prior to the reference made to it by the defense at trial. Assistant District Attorney Danny Smith ("Smith") addressed this issue to the trial judge outside the presence of the jury and stated that while he remembered the meeting, he did not remember tape-recording the meeting. Smith recalled that he was present along with Assistant District Attorney William Goodwin ("Goodwin"), and two of the three members of the defense, the Honorable Emma Simpson Vaughn and the Honorable Willard Brown. Neither Smith nor Goodwin remembered tape-recording the meeting, and the State could not produce the tape as it could not be found. The State asserts that even if this tape was made, the statements between Donnie and Diane were of no consequence, as they did not differ significantly from statements they had already made. Smith stated that he did not ask questions of Diane or Donnie at this meeting.

¶16. Northup asserts that during this interview, Donnie stated that he could not describe the knives used

during the murder. However, at trial, Donnie was able to describe both knives used, and he was even able to render a drawing of the knives for the jury. For this reason, Northup argued that the tape was exculpatory evidence and that Northup was severely prejudiced by the State's losing it. Northup asserts that this impeachment testimony could not be found elsewhere, and he was prejudiced when it was not produced. In addition, Northup asserts that Donnie's trial testimony influenced Hayne's testimony. The State has the duty to preserve evidence, but that duty is limited to that evidence which "might be expected to play a significant role in the suspect's defense." *Tolbert v. State*, 511 So.2d 1368, 1372 (Miss.1987) (quoting *California v. Trombetta*, 467 U.S. 479, 488, 104 S.Ct 2528, 2534, 81 L.Ed.2d 413, 422 (1984)).

¶17. When the defendant claims he is entitled to a new trial based on the prosecution's having lost or destroyed evidence, this Court employs a two-part test. First, it must be determined whether the evidence would have played a significant role in the defendant's case. To play a significant role, the exculpatory nature and value of the evidence must have been apparent before the evidence was lost. The second part of the test requires that the defendant have no way of obtaining comparable evidence by other means. *Tolbert*, 511 So.2d at 1372 (citations omitted).

¶18. Citing the "watershed case" *Trombetta,* we also noted the United States Supreme Court considered whether the government agents had acted in good faith and in accordance with normal practices, or whether a conscious effort was made to suppress the exculpatory evidence. *Tolbert*, 511 So. 2d at 1372 (citing *Trombetta*, 467 U.S. at 488, 104 S.Ct. at 2533, 81 L.Ed.2d at 422)). For example, we have held that, It is a general rule that the intentional spoilation or destruction of evidence relevant to a case raises a presumption, or, more properly, an inference, that this evidence would have been unfavorable to the case of the spoilator. Such a presumption of inference arises, however, only where the spoilation or destruction was intentional and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent. *Tolbert*, 511 So. 2d at 1372-73 (citing *Washington v. State*, 478 So. 2d 1028, 1032-33 (Miss. 1985).

¶19. Smith asserts that he did not question Donnie or Diane at this meeting, and it appears from the record that the defense conducted this meeting. It did not appear that the State acted in bad faith, and neither the trial judge nor the district attorney's staff were aware of the exculpatory nature of this tape prior to the mention of it by the defense during the trial. The trial judge expressed his regret in not knowing about the tape prior to that day, but reminded the defense that it could attempt to impeach Donnie's testimony on cross-examination. Therefore, the trial court is affirmed as to this issue.

### III. WHETHER THE JURY'S VERDICT WAS AGAINST THE OVERWHELMING WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

¶20. At the close of the State's evidence, Northup made a motion for a directed verdict, challenging the sufficiency of the evidence, and this motion was denied. On appeal, Northup again challenges the sufficiency of the evidence and also the weight of the evidence.

¶21. Northup argues that the inconsistencies in the witnesses' testimony were sufficient to raise a reasonable doubt as to his participation in the murder. For example, Chastity testified that she saw Northup and Donnie throw the knives into the river, but Donnie testified he never saw any knives being thrown into the river. A security guard at a convenience store testified that he saw Diane and Chastity enter the store the night of the murder and that there were two men sitting in their truck. While Diane testified that they stopped at a convenience store, Chastity did not testify to this, and Donnie testified that they had stopped at a gas

station. Chastity testified that she did not exactly see Northup when he got back in the truck, but she also testified that Donnie and Northup were in the back of the truck. Northup argues that because of these inconsistencies in the witnesses' testimony and the fact that there were no eyewitnesses to the murder other than his co-defendant, Donnie, the evidence does not support the weight of the jury verdict finding him guilty.

¶22. As to the weight of the evidence, we have held that the question of whether the verdict is against the overwhelming weight of the evidence is essentially an allegation that the trial judge erroneously overruled the motion for a new trial. *Wetz v. State*, 503 So. 2d 803, 812 (Miss. 1987) (citing *Gray v. State*, 487 So.2d 1304, 1311 (Miss. 1986)). The decision of whether to grant a new trial is in the sound discretion of the trial judge, and a new trial should only be ordered when the trial judge finds that the "verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice." *Wetz*, 503 So. 2d at 812 (citations omitted).

¶23. In determining whether the evidence in the record is sufficient to sustain a finding adverse to a defendant, we have held that we must consider all the evidence-not just the evidence which supports the case for the prosecution-in the light most favorable to the verdict. As we have stated, "The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Id.* at 808 (citations omitted).

¶24. It appears from the record that the testimony of Northup's co-defendants was sufficient to submit this matter to a jury for determination. The trial judge found the testimony of the witnesses was sufficient to implicate Northup in his participation in the death of Loper. The trial judge correctly overruled the motion for directed verdict, and this ruling is affirmed.

### IV. WHETHER NORTHUP WAS PREJUDICED AND THEREFORE RECEIVED AN UNFAIR TRIAL WHEN THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING A PHOTOGRAPH INTO EVIDENCE.

¶25. During the testimony of Detective James Coward, the State introduced a photograph of a knife and a folded note found behind a television in Northup's trailer. When the defense objected, Detective Coward admitted that although the knife was collected, it had no significance to the case. The court permitted the photograph to be admitted into evidence. Northup asserts that because the murder weapons were never recovered, the photograph allowed the jury to speculate that the knife in Northup's trailer might have been one of the weapons used to kill Loper.

¶26. The State responds that the photograph of the note, which also showed a knife that appeared to be a pocket knife folded into its case, had no prejudicial effect. The photograph was probative in that it showed the location where the note was found. Furthermore, the prosecution offered to withdraw the photograph if the defense would stipulate that the note was found in Northup's trailer. The defense refused to stipulate and, thus, the photograph was probative.

¶27. The note in question was headed "pepel to kill." Just under that title was, "I will let you no." The list included names, account numbers and license numbers for "Dian (sic) L. Bryant, James A. Bryant, etc…. " The photograph depicted the folded note as it was found behind the television set in Northup's trailer. The note is lying against the wall and under some electrical cords. The knife appears to be a red pocket knife, and it is lying next to the note.

¶28. The trial court is afforded broad latitude in admitting photographs. In *Williams v. State*, 544 So.2d 782, 785 (Miss.1987), we stated: "A review of our case law indicates that the decision of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and extenuation of probative value."

¶29. We have held that a reversal of a lower court's ruling on the admissibility of photographs will be had only when there has been an abuse of discretion. *Alexander v. State*, 610 So.2d 320, 338 (Miss.1992); *Jenkins v. State*, 607 So.2d 1171, 1175 (Miss.1992).

¶30. The jury in this case was told that the knives allegedly used in the murder were never recovered and that the knife depicted in State's ex.#35 had no connection to the murder. Under these circumstances, it was not an abuse of discretion for the trial court to allow the photograph into evidence. The trial court is affirmed.

## CONCLUSION

¶31. Finding no merit to the issues Northup has raised in his appeal, we affirm Northup's conviction and sentence of life imprisonment without the benefit of parole, probation or early release.

¶32. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE BENEFIT OF PAROLE, PROBATION, OR EARLY RELEASE, AFFIRMED.**

**PITTMAN, C.J., BANKS, P.J., MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR. SMITH, J., CONCURS IN RESULT ONLY.**

1. The indictment originally specified the date as July 29, 1996. It was amended during trial to specify July 28, 1996.

2. Pike County Circuit Court Judge Keith Starrett granted Northup an out-of-time appeal on December 30, 1998. However, this order failed to be put in the record when this case initially came to this Court. Because we had no knowledge of this order, on April 18, 2000, we ordered the case dismissed on the basis of lack of subject matter jurisdiction for Northup's failure to file a timely notice of appeal pursuant to Mississippi Rules of Appellate Procedure (M.R.A.P.) 4. Following a Motion to Reinstate Appeal and/or an Extraordinary Writ filed pro se by Northup on September 1, 2000, explaining the failure to include the December order of the trial court in the record, we issued another order on December 5, 2000, granting Northup's motion and reinstating his appeal. This matter is now properly before this Court to decide on the merits.

3. At the time of the murder, Chastity was pregnant by Donnie. The two were married in August of 1996.