# IN THE COURT OF APPEALS 10/01/96

# OF THE

# STATE OF MISSISSIPPI

## NO. 94-CA-00196 COA

**GERALDINE HURST, EXECUTRIX FOR THE ESTATE OF JOSIE CONNERLY; GERALDINE HURST AND KENNETH HURST**

**APPELLANTS/CROSS-APPELLEES**

**v.**

**SOUTHWEST MISSISSIPPI LEGAL SERVICES CORPORATION AND HILDA BURNETT BAKER**

**APPELLEES/CROSS-APPELLANTS**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. MELVIN KEITH STARRETT

COURT FROM WHICH APPEALED: PIKE COUNTY CIRCUIT COURT

ATTORNEY FOR

APPELLANTS/CROSS-APPELLEES:

JERRY L. MILLS

CAROLYN B. MILLS

WILLIAM A. PYLE

ATTORNEY FOR

APPELLEES/CROSS-APPELLANTS:

TOMIE T. GREEN

JOHN L. WALKER, JR.

NATURE OF THE CASE: PROFESSIONAL NEGLIGENCE

TRIAL COURT DISPOSITION: JURY VERDICT FOR DEFENSE ON ISSUE OF PROFESSIONAL NEGLIGENCE; VERDICT FOR PLAINTIFFS ON ISSUE OF TORTIOUS BREACH OF CONTRACT WITH ACTUAL AND PUNITIVE DAMAGES AWARDED


BEFORE BRIDGES, P.J., BARBER, AND SOUTHWICK, JJ.

SOUTHWICK, J., FOR THE COURT:


This appeal concerns allegations of professional malpractice relating to the manner in which Southwest Mississippi Legal Services Corporation and the attorney (*collectively*, "Legal Services") assigned to a case defended a suit against the Hursts to confirm title to mineral interests in land. The Appellants consist of the executrix of the estate of one individual and two others who allege interests in the real property that was the subject of the title action. When the Hursts were unsuccessful in defending against the title action, they sued Legal Services and alleged that it had been professionally negligent in its representation. In addition, they sued for tortious breach of contract based largely upon Legal Services' failure to perfect an appeal in the title action. The professional negligence action was initially resolved by summary judgment granted in favor of Legal Services. Following an appeal, the supreme court reversed summary judgment and remanded the case for further proceedings. *See Hurst v. Southwest Miss. Legal Servs. Corp.*, 610 So. 2d 374 (Miss. 1992).

A trial of the case following remand resulted in a jury verdict for Legal Services on the issue of professional negligence in the handling of the original trial. However, the jury concluded that Legal Services was liable to the Hursts on the tortious breach of contract claim regarding an appeal and awarded $40.00 in actual damages and $75,000.00 in punitive damages. The trial court granted Legal Services' JNOV motion and set aside the punitive damages award. The Hursts now appeal, alleging sixteen errors that challenge jury instructions, the trial court's refusal to grant partial summary judgment in their favor on the issue of professional negligence, evidentiary rulings, and the JNOV and new trial rulings. Legal Services cross appeals, challenging the jury's award of actual damages on the tortious breach of contract claim.

We affirm. Certain issues are raised on cross appeal that we also briefly address.

FACTS

The stage for this case was set in 1935 when the real property in question—several acres of land in Pike County—was the subject of a tax sale. One of the first cast members was Josie Connerly. Connerly, who is the Hursts' predecessor in title, was the daughter of the man who had lost the property to the State in the forfeiture. She began her possession of the property in 1943 when her father died and, at that time, discovered that it had been forfeited. Unbeknownst to Connerly, the property was sold by the State to W. A. Pritchard in 1944. Despite knowing of the forfeiture, Connerly did nothing to solidify her title in the property until 1947 when she learned that Pritchard

was soliciting bids for the purchase of the property.

Upon hearing of advertisements for the sale of the property, Connerly sought out Pritchard to prevent her ouster. On March 29, 1947, she obtained a quitclaim deed from Pritchard after paying $250.00. The quitclaim contained a conveyance of the land with the following provision that would later become the center of controversy: "[Pritchard] reserves all minerals in[,] on and under the above described tract of land with full right of ingress and egress at all times for the purposes of prospecting for, producing, storing, transporting and marketing said products and for housing his employees." Pritchard's interest was later conveyed to Roy Ellzey and Connerly's interest was conveyed to the Hursts.

In 1955, title was confirmed in the Hursts by virtue of an action they filed that did not name Ellzey or his predecessor as interested parties, despite being named in the deraignment of title filed concurrently with the initiation of the action. The Hursts brought the action in response to a request by a prospective construction financing lender in whose opinion there was trouble with the Hursts' title. In that action, the Hursts alternatively alleged entitlement to confirmation of title through adverse possession and the quitclaim deed given to their predecessor in title from the purchaser at the tax sale. The judgment confirming title in the Hursts accepted both adverse possession and the quitclaim as the foundation for good title.

Twenty-four years later, the Ellzey family sued to confirm title in the minerals, naming both the Hursts and their predecessor as defendants. The Hursts sought legal representation from Legal Services which assigned Hilda Burnett as the Hursts' attorney. Burnett filed an answer to the Ellzey suit but alleged no affirmative defenses. When the matter came to trial, Burnett failed to cross-examine any witnesses. Title to the minerals was confirmed in the Ellzeys. Burnett perfected an appeal but never filed a brief on behalf of her clients despite repeated extensions. The appeal was dismissed for lack of prosecution, and the Hursts alleged that they were never informed of the dismissal.

Breathing life into this controversy over the land in Pike County was its fruitful production of oil—resulting in hundreds of thousands of dollars in production revenues. Claiming these revenues as their most significant damages, the Hursts sued Legal Services, contending that it had been negligent in its handling of the defense against the Ellzey suit. The Hursts claim that, but for losing that suit, production revenues would have been paid to them—not the Ellzeys. Additionally, the Hursts claimed that the failure to file an appeal brief constituted tortious breach of contract which merited actual and punitive damages awards.

DISCUSSION

*1. Issues Resolved By 1992 Supreme Court Decision*

We begin by reviewing the effect of the prior supreme court decision in this case. *Hurst v. Southwest Miss. Legal Services Corp.,* 610 So. 2d 374 (Miss. 1992). The parties disagree here, as they did in the trial court, regarding just what issues were resolved in 1992. At least they agree that the supreme court reversed a summary judgment that had been granted to Legal Services and to the individual attorney who handled the Hursts' case, Hilda Burnett. The supreme court considered two issues in concluding that genuine issues of material fact existed. We will address them separately.

The supreme court first held that Josie Connerly, the grantee in the 1947 deed that purported to reserve the minerals, *could* have adversely possessed the minerals without exercising control over them. *Hurst,* 610 So. 2d at 378. By "exercising control," the court meant an exercise of ownership rights such as granting an oil and gas lease or otherwise affirmatively asserting a claim. The 1955 decree in the suit to confirm a tax title found Connerly to have adversely possessed "the land" since 1944. The minerals were not severed until three years after the beginning of adverse possession. The supreme court in *Hurst* said that absent some relinquishment by Connerly to a claim to the minerals, the mineral "severance was ineffective and Connerly's adverse possession continued to run to both surface and minerals." *Id.* at 379.

It is this set of conclusions which causes the first disagreement between the parties in the present appeal. Did the supreme court hold that absent some act by Connerly to relinquish her claim, the issue of adverse possession of surface and minerals was forever and against everyone resolved in favor of Connerly? We agree with the circuit court, which held after remand and during the trial, that this could not be the supreme court's holding. It must be remembered that Roy Ellzey, the record title owner to the severed minerals in 1955, was never given legal notice nor made a party to the suit to confirm tax title. What Hurst claims on appeal is that the record owner of a severed mineral interest can be divested of title by a suit in which he was not made a party. Hurst would have us believe that the supreme court during the first appeal of the case discarded well-established rules of *res judicata* and collateral estoppel without even acknowledging it had done so. Such an unannounced revolution in the law should be presumed only with great care.

Both *res judicata* and collateral estoppel require the same four identities: the subject matter, the cause of action, the parties to the cause of action, and the quality or character of the person against whom the claim is made. *Dunaway v. W.H. Hopper & Assoc.,* 422 So. 2d 749, 751 (Miss. 1982) *(quoted in McIntosh v. Johnson*, 649 So. 2d 190, 193 (Miss. 1995)). The different doctrines resolve different questions, i.e., claim preclusion as opposed to issue preclusion, but the threshold for the application of either is the same. Since the severed mineral owner was not a party to the 1955 suit, which means there was no identity of parties, neither doctrine applies here. The successors to Roy Ellzey could litigate for the first time in 1979 whether any adverse possession occurred as to their interest.

There is language in *Hurst* suggesting "back-door" collateral estoppel, as when the court stated that Ellzey would be collaterally estopped from contesting whether Connerly adversely possessed the surface from 1944 until the 1955 decree. *Hurst,* 610 So. 2d at 381. The point appears to be that since Ellzey never claimed to be a surface owner, a determination that adequate adverse possession occurred to give Connerly ownership of the surface was binding on him even though that determination necessarily carried with it adverse possession of unsevered minerals. By being thus estopped, the Hursts argue that the only issue Ellzey could raise would be whether Connerly in some fashion had waived the claim to the minerals. That cannot be. Because of the requirement of identity of parties for collateral estoppel, a nonparty such as Ellzey whose claim was not derived after judgment from a party, could not be bound by the 1955 decree. The supreme court has quite recently written on this question:

> Much has been written in our decisions about collateral estoppel, perhaps at times
> overmuch, but this much should be clear: in the absence of passing technical muster of the

previous [legal] action involving identical parties, identical legal issues, and the same facts required to reach a judgment, it cannot be applied. And, even where it arguably meets technical muster, "the rule is neither mandatory nor mechanically applied." *Jordan v. McKenna,* [573 So. 2d 1371, 1375 (Miss. 1990)].

*Marcum v. Mississippi Valley Gas Co.,* 672 So. 2d 730, 733 (Miss. 1996). Here, the argument for estoppel does not even pass technical muster, much less rising to the level of an abuse of discretion if the trial court refused to apply the doctrine. *Marcum,* 672 So. 2d at 734. Until 1979 the severed mineral owner had not on this issue had his day in court, as is required by due process. *McCoy v. Colonial Baking Co.*, 572 So. 2d 850, 854 (Miss. 1990).

This result is also mandated by a review of the statutes under which the 1955 action was brought. An examination of the "Bill to Confirm Tax Title," filed on January 13, 1955, reveals that it sought "to confirm a tax sale and title within themselves . . . ." Notice was given to Attorney General J.P. Coleman in order to confirm the forfeited tax land patent. That notice was required under section 1315 of the Mississippi Code of 1942, which has been brought forward unchanged as section 11-17-3 of the 1972 Code. Notice was also given to all heirs of the record title owner at the time of the tax sale to the state. That notice was necessary under section 1314 of the 1942 Code, now section 11-17-1 of the present Code. Confirmation under section 11-17-1 is "conclusive evidence that the title to said land was vested in the complainant, as against all persons claiming the same *under the title existing prior to the sale for taxes."* Miss. Code Ann. § 11-17-1 (1972) (emphasis added). Confirmation against the state under 11-17-3 "shall forever estop and preclude the state and other parties from thereafter questioning the validity of the patent . . . ." Id. § 11-17-13. Thus neither of those statutes affects individuals whose claims arise after the patent from the state.

Though the 1955 pleadings do not refer to statutes, it would appear the claimant was also seeking to confirm title under section 1323 of the 1942 Code, now codified as section 11-17-29. That section allows anyone to have title "confirmed and quieted." By showing adverse possession for ten years since the 1944 forfeited tax land patent, the complainant put on evidence that went beyond just the validity of the tax sale and subsequent state patent. A decree under this section confirms title and is "conclusive evidence of title as determined from the date of the decree *as against all parties defendant."* Miss. Code Ann. § 11-17-29 (1972) (emphasis added).

It is evident that the three statutes that were the basis for the 1955 suit explicitly disclaim any impact upon a non party or in the case of the tax sale confirmation, someone whose title arises after the tax patent was issued. Roy Ellzey's interests were not affected by the 1955 decree.

What then are we to make of the supreme court's language in *Hurst* ? The important factor that was central to the decision, is that the plaintiffs had summary judgment entered against them. This meant that the trial judge had found as a matter of law that adverse possession could not have been a good defense. The issue the *Hurst* court resolved on appeal is, as the court itself said, Connerly "could" have adversely possessed the minerals without exercising control over them. *Id.* at 378. The supreme court held that adverse possession of "the land" from 1944 until 1955 could have included the minerals. Whether it did include the minerals or not was a matter to be answered by presenting such evidence as the parties desired, but could not be answered on summary judgment. Ellzey, finally having his day in court, could submit evidence to try proving that the possession for the proper

period of time, adverse to his interest, did not occur. Whatever decision was reached in that suit would not undermine the 1955 decree insofar as the parties bound by it were concerned.

We acknowledge the language of *Hurst* does not readily lend itself to this reading. However, any other reading leads to a *sub silentio* overruling of decades of precedents on issue and claim preclusion, precedents that have been reaffirmed after *Hurst*. One thing is clear from *Hurst,* and that is that the court did not admit to doing any such thing. Consequently, we hold it did not do so. That was also the conclusion of the circuit court when these questions were raised after remand. Thus the case was tried under the interpretation of *Hurst* that we have given it here.

The second issue resolved by the supreme court during the first appeal in 1992 was whether Connerly's accepting of the 1947 deed, which contained the mineral reservation, constituted a relinquishment of Connerly's adverse possession claim to the surface and minerals. The court held the mere acceptance of a conveyance of such title as another claimant might be willing to concede, did not automatically constitute a relinquishment by the grantee of a claim to a greater part. Even so, "facts may exist which show the quitclaim deed from Pritchard to Connerly amounted to an accord and satisfaction with respect to the minerals . . . ." *Hurst*, 610 So. 2d at 380.

In summary, the original *Hurst* opinion found that adverse possession could have been running against Roy Ellzey, and that Connerly's mere acceptance of the Ellzey quitclaim deed did not as a matter of law constitute a relinquishment of a claim to the minerals. Consequently, the resolution of the case required a remand for further proceedings.

*2. Jury Instruction Issues From 1993 Trial*

After remand an eight-day trial was held in October 1993. Most of the issues now raised by Hurst concern jury instructions that were given for the Defendants. It is in these claims that the understanding of what the supreme court did in the 1992 *Hurst* opinion becomes central.

*A. Giving To The Jury The Issue Of Whether Burnett Was Negligent*

Instruction number 11 informed the jury that Burnett was negligent "only if her judgment or decision is one which would not have been made by a competent lawyer in the same field who was faced with the same or similar situation . . . ." If the jury believed that a competent lawyer exercising legal judgment "would not have raised the defense of adverse possession," then the jury should return a verdict in favor of Burnett and Legal Services.

Hurst argues that negligence was established as a matter of law by the 1992 supreme court decision. That is not so. Even under a misreading of *Hurst,* that is, even if the case is read to mean adverse possession could not be contested by the severed mineral owner Ellzey, that does not mean a failure by Burnett to raise adverse possession was negligence as a matter of law. The failure to raise an issue that in hindsight would have won a case does not establish negligence. To support a claim of legal malpractice, a client must prove by a preponderance of the evidence (1) the existence of a lawyer-client relation; (2) negligence on the part of the lawyer, and (3) the negligence was the proximate cause of the injury. *Hickox v. Holleman,* 502 So. 2d 626, 633-34 (Miss. 1987). A lawyer "owes his client the duty to exercise the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession similarly situated, [i.e., that degree of care commonly possessed and

exercised by attorneys in practice in the jurisdiction]." *Hickox,* 502 So. 2d at 634; *see Hutchinson v. Smith,* 417 So. 2d 926, 928 (Miss. 1982).

Professional negligence has to be proved by expert testimony. *Stevens v. Lake,* 615 So. 2d 1177, 1185 (Miss. 1993). Burnett and Legal Services put on two expert witnesses whose opinion was that Burnett was not negligent in failing to raise adverse possession as a defense. Some of their reasoning is the same as set out above regarding why Ellzey's interest was not affected by the determinations in the 1955 suit. They went further and opined that adverse possession would have been an unsuccessful defense. The Plaintiffs put on contrary expert opinions that Burnett was professionally negligent. The jury answered a special interrogatory and found that Burnett was not negligent in failing to raise adverse possession.

We hold that professional negligence was an issue properly presented to the jury for its decision. That decision was to be based on the jury's weighing of the expert testimony. The attorneys, whose qualifications as experts are not questioned here on appeal, gave their opinion that it was not negligent for Burnett to fail to raise the adverse possession issue. Our role is not to determine whether adverse possession would have won the 1979 case for the clients represented by Burnett and Legal Services. Our function is to determine whether there was adequate evidence to present to the jury the question of whether Burnett's failure to raise adverse possession as an issue fell below acceptable levels of skill and diligence. That is a fact question resolved by the jury, based on competent evidence, against the Plaintiffs. We will not disturb that finding. Though this court is supposed to be expert on the law, the question here is a factual one: did the level of skill required for an attorney necessitate a decision that adverse possession was a viable issue and mandate raising it in the 1979 case? There was sufficient evidence to support the jury's conclusion.

There is a separate issue of Burnett's competence during the appeal from the 1979 decree. That will be addressed later.

### B. Remaining Jury Instruction Issues

There are additional jury instruction arguments raised by the Hurst that are moot because of the jury's finding that Burnett was not negligent. In summary, these instructions are as follows:

1) Instruction 12 allowed the jury to find for Burnett and Legal Services even if they believed there was professional negligence in failing to raise adverse possession. A defense verdict was to be reached if the jury believed that adverse possession, once raised, was not a meritorious defense.

2) Instruction 18 required the jury to determine whether the mineral owners received notice of the 1955 suit, and if not, to find that the mineral owner was not bound.

3) Instruction 19 told the jury that the grantee of a deed, meaning the 1947 quitclaim that reserved the minerals, is charged with knowledge of what is in the deed.

4) Instructions 20 and 21 discussed abandonment or interruption of adverse possession.

5) Instruction 22 discussed the elements of adverse possession and required the jury to determine

whether adverse possession had occurred.

6) Instruction 23 required the jury to determine whether Connerly intended to possess adversely against the severed mineral owner.

7) Instruction 24 required the jury to evaluate whether Connerly recognized a superior title in the severed mineral owner.

We do not address these instructions because of the jury's determination on the overriding issue of professional negligence. These instructions discuss alternative ways that the adverse possession claim, if raised, might have failed as a defense. In such an event, any professional negligence would not have been the proximate cause of the loss in 1979. Since the jury found there to be no negligence in failing to raise the adverse possession defense, these alternatives are irrelevant.

*3. Failure To Grant Summary Judgment On Negligence*

The Hursts argue that the 1992 supreme court decision resolved the question of negligence in their favor unless Legal Services or Burnett presented evidence that the 1947 quitclaim deed was an accord and satisfaction of a disputed claim. That is a misreading of *Hurst,* regardless of one's views on whether the language concerning collateral estoppel is overbroad. All that the supreme court resolved in 1992 is that the summary judgment entered by the trial court, based on its conclusion that adverse possession could not have encompassed the minerals, was erroneous. As the supreme court said, Legal Services "built its summary judgment motion around the proposition that Burnett's acts, as a matter of law, did not cause the plaintiffs' injury." *Hurst,* 610 So. 2d at 384. That was a judgment based on the absence of proximate cause, which the supreme court found to be the subject of genuine disputes of material fact. The threshold issue of whether there was negligence was not addressed by the summary judgment, nor by the supreme court in reversing that judgment.

The trial court properly sent the question of negligence to the jury.

*4. Failure To Grant Plaintiff's Motion* In Limine

Before trial, the Hursts filed a motion that would have barred the defense from making fact issues out of various matters that the Hursts argued were resolved by the supreme court's decision in *Hurst.* As we have already held, the supreme court reversed because there were genuine issues of material fact regarding adverse possession and waiver or relinquishment. The court did not hold that the questions were answered against Legal Services and Burnett. It was proper for the trial court to deny this motion.

*5. Granting Of Legal Services Motion* In Limine

Legal Services and Burnett presented what in essence was the mirror image of the Hurst motion in limine. Whereas the first motion in limine improperly sought to bar the defense from making a fact issue out of matters that we hold were not resolved by the 1992 *Hurst* opinion, the defense sought to bar the Hursts from arguing that these fact questions were conclusively answered by the supreme court.

We hold that these were the fact questions that had to be answered by the jury at trial. It was proper

to grant the defense motion that barred Hurst witnesses from telling the jury otherwise.

The separate issue raised by the Hursts, that certain instructions should have been granted that in essence peremptorily instructed the jury regarding these fact questions, is also without merit.

## 6. Motion In Limine *Regarding Ellzey Being Chancery Clerk in 1955*

The Roy Ellzey who had record title to the minerals prior to the 1955 suit was at that time chancery clerk of Pike County. The Hursts wished to argue that his duties as chancery clerk necessarily gave him adequate notice of the 1955 litigation to put him under the same obligations to respond to the litigation as if he were a party.

The Hursts cite no authority to us that actual notice of a suit by someone who is not a party requires that individual to inject himself into the litigation. The plaintiff chooses whom to sue, and seeks service of actual process or notice by publication accordingly. Ellzey was not an absent or unknown owner whose identity could not be discovered by reasonable diligence. In fact he was known, and he accepted, constructively at least, the pleadings in the suit. There is evidence that the 1955 suit was brought because of the complainant's need to confirm title in order to get a Veterans Administration loan, a need that did not depend on ownership of minerals. Regardless of whether that is true, that possibility is just one of many that indicates why it is more than just sloppy, it is a denial of due process to bind individuals to litigation in which they were not joined and whose interest may have been deliberately ignored by the Plaintiffs.

The court was correct in granting the motion in limine to prevent the jury from being confused by evidence of Ellzey's official role as chancery clerk, since the role was irrelevant.

## 7. Refusal To Strike Testimony of Attorney Thomas A. Cook

Thomas Cook, a Jackson attorney and specialist in oil and gas matters, was called as a fact witness by Legal Services and Burnett. He had been employed in 1978 to prepare an oil and gas title opinion on land that included the acreage owned by the Hursts. He discussed the opinion briefly, and also noted that he had determined that Ellzey was the mineral owner, and that the 1955 decree had not affected that interest since Ellzey was not made a party. On cross-examination, the Hursts' attorney asked about the impact of adverse possession on this severed mineral interest. Mr. Cook pointed out that his 1978 opinion had requested information on adverse possession, but that he did not at the time of trial know what the possession information showed.

When the Hursts' attorney asked for a legal conclusion regarding the effect of accepting a quitclaim deed, there was an objection. The point was made that Mr. Cook was offered only as a fact witness, discussing that the title opinion had been written and what it had concluded, and had not been qualified as an expert. The Hursts' attorney agreed he did not wish TO go beyond the scope of the witness's direct examination. Even so, shortly thereafter a proffer out of the presence of the jury was made regarding certain of Mr. Cook's conclusions. He was specifically asked whether his conclusions were inconsistent with anything in the supreme court's 1992 *Hurst* decision. As he was pressed for an answer, the witness stated that he did not wish to respond because he might say something arguably inconsistent with the interest of the client for whom he had conducted the title search. The Hursts moved to strike all the testimony as a result, but the motion was overruled.

The trial court held that Mr. Cook was only called as a fact witness, and was never qualified in order to render expert testimony. The Hursts were attempting to get an expert opinion of the effect of the 1992 supreme court opinion on Mr. Cook's own 1978 conclusions. When Mr. Cook would not answer that question because of attorney-client privilege, Hurst argued all the testimony was now invalid. In fact, the only question that Mr. Cook would not answer is one that called for a conclusion from an expert, and he was not an expert witness. The court properly denied the motion to strike his previous testimony.

8. *Failure Of Court To Grant The Hursts' A New Trial Or A JNOV*

This issue merely restates the Hursts' arguments regarding what issues had previously been resolved in the supreme court's *Hurst* decision. Having found the trial court to have made a proper interpretation of that opinion, we necessarily hold that the court need not have granted a new trial or a JNOV because of those rulings.

9. *Court's Granting Of JNOV For Defendants*

The jury found Legal Services and Burnett not to be negligent on the issue of adverse possession. However, the jury believed there to be negligence resulting from Burnett's failure to prosecute diligently an appeal. After the 1979 trial, Burnett filed an appeal. There was evidence that Burnett subsequently advised her clients, the Hursts, that an appeal would be futile and as a result, she and Legal Services would not pursue it. Burnett requested several extensions for filing a brief, ostensibly so that the Hursts could get alternative counsel. The Hursts denied that there were discussions regarding getting alternative counsel. Burnett never filed a brief nor withdrew from the case. Consequently, the appeal was dismissed by the supreme court. The Hursts claimed Burnett never told them of the dismissal, a point denied by Burnett.

An interrogatory was given to the jury: "Do you find from a preponderance of the evidence that Attorney Burnett's failure, if any, to file a brief or properly withdraw was the proximate cause of any damages to plaintiff?" The jury answered affirmatively. The amount of the damage, however, was said to be $40 -- the appeal filing fee that was advanced by the Hursts. After a separate trial just on punitive damages, the jury was asked whether Burnett's failure to withdraw was "a wilful, wanton, malicious, fraudulent, intentional or grossly negligent breach of her legal obligation to plaintiffs?" The jury put a check on the "yes" line, and then someone underlined the phrase "grossly negligent" in the question as if to say that was the jury's conclusion.

The last interrogatory asked what amount in punitive damages should be awarded against Legal Services and Burnett. The jury set the amount at $75,000, and underlined Legal Services name, as if Burnett was not being found liable for the payment. The trial court ultimately granted a JNOV to Burnett and Legal Services on punitive damages. The court applied a recently enacted statute that limits punitive damage awards:

> Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.

Miss. Code Ann. § 11-1-65(1)(a) (Supp. 1996). This statute became effective July 1, 1993.

The trial court found the statute to be applicable. The cause of action accrued well before July 1, 1993, but the trial was conducted afterwards. The statute itself says the quoted section "shall apply to all pending actions in which judgment has not been entered on the effective date of the act . . .." Miss. Code Ann. § 11-1-65, ed. note. The parties do not address whether the statute properly was made retroactive, i.e., whether any vested rights were affected, and we find no real question either. The general rule is that procedural statutes that do not affect the substantive rights of parties apply retroactively. *City of Clarksdale v. Mississippi Power & Light Co.,* 556 So. 2d 1056, 1057 (Miss. 1990).

> Remedial statutes relating to remedies which do not take away vested rights but only operate in furtherance of the remedy do not come within the general rule against retrospective operation of statutes. 73 Am.Jur. 2d, *Statutes,* § 354 (1974).

*Bell v. Mitchell,* 592 So. 2d 528, 533 (Miss. 1991). Punitive damages are a remedy, and thus a statutory change in the guidelines for that remedy may be applied to pending cases.

What the Hursts argue is that the statute is inapplicable because it expressly exempts contract actions from its coverage. Miss. Code Ann. § 11-1-65(2)(a) (Supp. 1996). However, what is being alleged as the foundation for punitive damages is not a pure breach of contract, for which punitive damages would be inappropriate. *See Sessoms v. Allstate Ins. Co.*, 634 So. 2d 516, 519 (Miss. 1993) (citations omitted). The Hursts allege "the *tort* of bad faith, not a breach of contract *per se.*" *Hurst,* 610 So. 2d at 383. The supreme court held that the Hursts' claims sounded in tort, and in fact if tort and contract counts had been joined, the Hursts would have to elect between them. *Id.* Thus Section 11-1-65 is applicable.

We next turn to whether any of the stated bases for punitive damages exist. There was never any evidence of malice by Burnett directed towards her clients. The second category under the statute is "gross negligence that evidences a willful, wanton or reckless disregard for the safety of others . . . ." The jury may have found gross negligence, if the underlined part of the jury instruction can be taken as the jury's limiting of its finding. However, the statute does not permit punitive damages whenever there is evidence of gross negligence, but only if there is gross negligence that exhibits a "disregard for the safety of others." One could argue that "safety" could include financial well-being, or some other metaphorical usage, but case law requires us to take undefined statutory terms in their normal and customary meaning. *See Anderson v. Jackson Mun. Airport Authority*, 419 So. 2d 1010, 1013-14 (Miss. 1982). We find that the gross negligence section of the punitive damage section is expressly limited to situations in which the defendant's conduct endangers physical safety. That did not occur here.

Finally, punitive damages can be awarded based on actual fraud. The only fraud alleged here is that Burnett may not have told her clients that the appeal had been dismissed. That issue was contested. "Actual fraud" is distinct from "constructive fraud":

> *Actual fraud* consists in deceit, artifice, trick, design, some direct and active operation of the mind; it includes cases of the intentional and successful employment of any cunning, deception, or artifice used to circumvent or cheat another. It is something said, done or omitted by a person with the design or perpetrating what he knows to be a cheat or deception. *Constructive fraud* consists in any act of commission or omission contrary to legal or equitable duty, trust or confidence justly reposed, which is contrary to good conscience and operates to the injury of another . . . . Or, constructive frauds are such acts or contracts as, though not originating in any actual evil design or contrivance to perpetrate a positive fraud or injury upon other persons, are yet, by their tendency to deceive or mislead other persons, or to violate private or public confidence, or to impair or injure the public interests, deemed equally reprehensible with actual fraud.

*Black's Law Dictionary,* 661 (6th Ed. 1990)(emphasis added). The definition concludes by describing constructive fraud as "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault . . . by misleading another to his prejudice . . . ." *Id.* Intent is the key. The evidence here does not support an intent to injure the Hursts, or an evil design, but at most a breach of duty of informing the clients, a breach precipitated by a desire to gain the advantage of not pursuing the appeal after other arrangements failed to be made.

Under section 11-1-65, there was no jury question regarding punitive damages. The trial court properly granted a JNOV to set aside the award of $75,000.

### 10. Cross Appeal

Legal Services and Burnett also argue certain errors on cross appeal. Most are moot because of our disposition of the case. The one issue that is alive is the question of whether $40.00 could be awarded as damages once the jury determined no negligence had occurred. That $40.00 was the cost of filing a notice of appeal.

The liability for failure to pursue an appeal after agreeing to handle one, is a separate issue from whether any professional malpractice occurred at trial. The jury found Burnett not to have been negligent. That may or may not mean the jury found adverse possession would not have been a winning defense, but only means Burnett was within the range of required competence when she failed to raise it. After agreeing to pursue the appeal, a separate implied contract obligation arose. The jury found that Burnett and Legal Service's obligations under that contract were not fulfilled. The Hursts acknowledged that they could not have won the appeal, so the only question is what damage occurred by the failure to pursue it. The answer reached by the jury, a perfectly sensible answer, is that since the appellate process would not have reversed the trial judgment, the only damage was the out-of-pocket cost of pursuing the appeal. That was $40.00.

We hold that the finding of no negligence did not answer the breach of contact claim. This cross appeal issue, the only issue alive after our resolution of the direct appeal, is without merit.

### Conclusion

Adverse possession may or may not have been a winning issue had it been raised, and the jury was entitled to conclude based on competent expert testimony that no negligence was exhibited by failing to present that doctrine as a defense. The interrelation of adverse possession with the 1955 decree confirming title, entered in a lawsuit in which the mineral owner was given no notice, following a quitclaim deed accepted by the Plaintiffs in which the minerals were reserved, is not a matter lending itself to obvious and immediate answers.

There is a difference between not knowing whether a defense will succeed, and not thinking to raise it at all. Admittedly, hindsight is a great instructor. The jury may have determined the clarity of the issue was more pronounced in retrospect than would have appeared to a competent lawyer in advance. This Court does not render a verdict as does a jury. There was sufficient evidence to uphold the jury's decision that no negligence occurred. Consequently, the verdict must be sustained.

**THE JUDGMENT OF THE PIKE COUNTY CIRCUIT COURT IS AFFIRMED ON DIRECT AND CROSS-APPEAL. COSTS OF THIS APPEAL ARE TAXED ONE-HALF TO THE APPELLANTS ON DIRECT APPEAL AND ONE-HALF TO THE APPELLANTS ON CROSS-APPEAL.**


**FRAISER, C.J., BRIDGES AND THOMAS, P.JJ., BARBER, COLEMAN, DIAZ, KING, McMILLIN, AND PAYNE, JJ., CONCUR.**