# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CP-01842-SCT

*RONALD HENRY PIERCE*

*v.*

*ERNEST ALLAN COOK, SR.*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/07/2006 |
| TRIAL JUDGE: | HON. SAMAC S. RICHARDSON |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | PRO SE |
| ATTORNEYS FOR APPELLEE: | JOHN G. HOLADAY |
| | GEORGE M. YODER, III |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 08/14/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.    Ronald Henry Pierce appeals from a Rankin County Circuit Court judgment entered against him and in favor of Ernest Allan Cook, Sr. in the amount of $1,500,000 on claims of alienation of affection, breach of contract, and intentional infliction of emotional distress. Finding no error, we affirm.

**FACTS AND PROCEEDINGS IN THE TRIAL COURT**

¶2.     During the fall of 1997, Ernest Allan Cook, Sr. (Cook), and his wife, Kathleen Susan Shorkey Cook (Kathleen), entered into a contract with attorney Ronald Henry Pierce to represent them and their minor son, Ernest Allan Cook, Jr., in a medical-malpractice claim. At the time Pierce commenced the suit on the medical-malpractice claim on February 13, 1998, he was practicing law in Oxford with the law firm of Rayborn & Pierce. In September 1999, the law firm of Rayborn & Pierce dissolved and Pierce moved his law practice to Pearl, in Rankin County.

¶3.     In June 2000, Cook decided to pursue a career in the film industry in California. Cook moved to California while his wife and children stayed in Mississippi. Cook frequently visited his family in Mississippi, but he spent the majority of his time in California away from the marital home. In September 2000, Cook and Kathleen separated and ceased marital cohabitation.

¶4.     On or about September 30, 2000, after Cook had moved to California, but while Pierce was still representing Cook and his family, Pierce commenced an adulterous affair with Kathleen. By October 2000, Cook was aware of the affair and had hired a private investigator. In December 2000, Pierce was terminated as the attorney for the Cooks in their medical-malpractice claim. On June 3, 2002, Cook was granted a divorce from Kathleen on the grounds of uncondoned adultery. Kathleen and Pierce were subsequently married and to this union was born one child.

2

¶5.    On December 23, 2002, Cook filed a complaint against Pierce in the Circuit Court of Rankin County alleging alienation of affection, breach of contract, and intentional infliction of emotional distress, based on the adulterous affair between Kathleen and Pierce. On June 20-23, 2006, a trial was held in the Rankin County Circuit Court, Judge Samac S. Richardson presiding. At the close of Cook's case-in-chief, Pierce moved for a partial directed verdict on Cook's claims of breach of contract and intentional infliction of emotional distress. As to Cook's breach-of-contract claim, Pierce asserted that the claim was actually one for legal malpractice, and that, since Cook had failed to offer expert testimony to prove his claim of legal malpractice, his claim failed. As to Cook's claim for intentional infliction of emotional distress, Pierce raised the affirmative defense that the statute of limitations had expired. The trial court denied Pierce's motion for partial directed verdict on both grounds.

¶6.    The trial proceeded, and the jury ultimately returned a verdict in favor of Cook and against Pierce, as follows: $300,000 on the alienation-of-affection claim; $200,000 on the breach-of-contract claim; and $1,000,000 on the intentional-infliction-of-emotional-distress claim. On July 7, 2006, the trial court entered judgment in the total amount of $1,500,000 in favor of Cook and against Pierce. Thereafter, Pierce filed a motion for a judgment notwithstanding the verdict or, alternatively, for a new trial, which motion the trial court denied by order entered on September 27, 2006. On October 25, 2006, Pierce timely appealed from the trial court's final judgment and order denying post-trial motions.

¶7.    Pierce assigns various issues for us to consider, and we restate these issues here for the sake of today's discussion.

3

## DISCUSSION

## I. WHETHER THE TRIAL COURT ERRED IN DENYING PIERCE'S MOTION FOR PARTIAL DIRECTED VERDICT.

¶8. The standard of appellate review in considering a trial court's grant or denial of a directed verdict is well-settled in Mississippi. The grant or denial of a directed verdict is reviewed *de novo*. *White v. Stewman*, 932 So. 2d 27, 32 (Miss. 2006) (quoting *Steele v. Inn of Vicksburg, Inc.*, 697 So. 2d 373, 376 (Miss. 1997) (citing *Sperry-New Holland v. Prestage*, 617 So. 2d 248, 252 (Miss. 1993))). Additionally,

> [T]his Court will consider the evidence in the light most favorable to the appellee [nonmovant], giving that party the benefit of all favorable inference [sic] that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant [movant] that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.

*White*, 932 So. 2d at 32 (quoting *Steele*, 697 So. 2d at 376).

### A. Breach of Contract

¶9. First, Pierce urges that his motion for partial directed verdict should have been granted as to Cook's claim for breach of contract. Essentially, Pierce asserts that Cook's claim for breach of contract is in reality a claim for legal malpractice, and Cook is thus required to provide expert testimony to support his claim of legal malpractice. *Hickox v. Holleman*, 502 So. 2d 626, 635 (Miss. 1987); *Dean v. Conn*, 419 So. 2d 148, 150 (Miss. 1982) (expert testimony ordinarily is necessary to support an action for legal malpractice).

4

¶10.    On the other hand, Cook alleges that he did not assert a claim for legal malpractice against Pierce. Instead, according to Cook, Pierce did not commit malpractice in the performance of his legal duties, but instead breached his fiduciary duty towards Cook when he had an adulterous affair with Kathleen.  Therefore, Cook claims he was not required to prove the elements of legal malpractice nor was he required to provide expert testimony to support his claim for breach of contract.  Cook's arguments notwithstanding, we will discuss Pierce's assertions that Cook's breach-of-contract claim is a camouflaged legal-malpractice claim.

¶11.    In order to prevail on a claim for legal malpractice, one must prove by a preponderance of the evidence:  (1) the existence of an attorney-client relationship; (2) negligence on the part of the lawyer in handling the affairs of the client which have been entrusted to the lawyer; and (3) proximate cause of the injury.  *Hickox,* 502 So. 2d at 633. "As to the second factor, a lawyer owes his client the duty to exercise the knowledge, skill, and ability ordinarily possessed and exercised by the members of the legal profession similarly situated. Failure to do so constitutes negligent conduct on the part of the lawyer." *Id*. at 634. As to the third factor, "the plaintiff must show that but for their (sic) attorney's negligence, they would have been successful in the prosecution or defense of the underlying action." *Id. See also  Nause v. Goldman,* 321 So. 2d 304 (Miss. 1975); *Thompson v. Ewing's Hatcheries, Inc.,* 186 So. 2d 756 (Miss. 1966).

¶12.    That being said, this Court has recognized that each lawyer owes his or her client certain duties which fall into three broad categories: "(a) the duty of care; (b) a duty of

5

loyalty; and (c) duties provided by contract." ***Singleton v. Stegall,*** 580 So. 2d 1242, 1244 (Miss. 1991).

¶13. In the second allegation of Cook's complaint entitled "breach of contract and fiduciary duty," Cook alleges:

> As a result of the contractual attorney-client relationship entered into by and between PIERCE and COOK, PIERCE did owe to COOK a fiduciary duty of loyalty which prohibited PIERCE from undertaking representation directly adverse to COOK without COOK's consent. Further PIERCE had an obligation to preserve the confidences and secrets of COOK even after the termination of his employment. PIERCE breached his fiduciary duty to COOK implied by the contractual agreement and legally imposed upon PIERCE . . .

¶14. Thus, Pierce contends Cook's claim falls within the ambits of a legal-malpractice claim, and "[c]learly established law provides that expert testimony is necessary to establish the breach of a duty of care in a claim of legal malpractice." ***Byrd v. Bowie***, 933 So. 2d 899, 904 (Miss. 2006) (quoting ***Lane v. Oustalet,*** 873 So. 2d 92, 99 (Miss. 2004)).

¶15. However, we acknowledged in ***Byrd*** that this Court had previously "carved out some exceptions to the general rule that expert testimony is required in a legal malpractice claim." ***Byrd***, 933 So. 2d at 904 (citing ***Hickox***, 502 So. 2d at 635; ***Thompson***, 186 So. 2d at 759). Thus, this Court has recognized that experts are not required in all legal-malpractice cases. As such, Cook claims that even if he has asserted a claim for legal malpractice, he still was not required to provide expert testimony supporting his claim.

¶16. This Court stated in ***Byrd***:

> In discussing the need for experts for legal malpractice actions, we stated:

6

> Moreover, attorneys involved in malpractice actions must always remember there is a pragmatic difference between the trial of other professional malpractice cases and a legal malpractice case. In the former class, the lawyers and judges are laymen. In professional malpractice cases, excepting extreme cases, we rely upon experts for guidance. The attorney who finds himself the defendant in a legal malpractice case, however, has a judge and the trial attorneys who are already experts.

*Hickox*, 502 So. 2d at 636.

> Furthermore, "[i]t does not require expert testimony to establish the negligence of an attorney who is ignorant of the applicable statute of limitations or who sits idly by and causes the client to lose the value of his claim for relief." *Id*. (quoting *George v. Caton*, 93 N.M. 370, 600 P.2d 822, 829 (N.M. Ct. App. 1979)).

*Byrd*, 933 So. 2d at 904-05.

¶17. In the end, we find that it is of no moment as to whether Cook's claim was one of legal malpractice or breach of contract. Even assuming *arguendo* that Cook asserted a claim for legal malpractice, Cook still was not required to provide expert testimony to support his claim. Clearly, based on the facts of this case, Cook did not need an expert to testify as to the standard of care owed by an attorney to his client. Ordinary jurors possess the requisite knowledge and lay expertise to determine if an adulterous affair between an attorney and his client's wife is a breach of a duty owed by an attorney to his client. Expert testimony would not lend guidance under this circumstance.

¶18. When we consider the totality of the evidence in the light most favorable to Cook, as well as all reasonable inferences which may be drawn from the evidence, there is no doubt that there was before the jury evidence of such quality and weight that reasonable and

7

fairminded jurors, in the exercise of fair and impartial judgment, could have reached different conclusions as to the appropriate verdict. Thus the trial court's denial of Pierce's motion for a directed verdict on Cook's breach-of-contract claim is beyond our authority to disturb. *Tupelo Redevelopment Agency v. Gray Corp.*, 972 So. 2d 495, 505-06 (Miss. 2007) (citing *White*, 932 So. 2d at 32).

¶19.    We find this issue to be without merit.

## B. *Intentional Infliction of Emotional Distress*

¶20.    Next, Pierce asserts that his motion for a directed verdict should have been granted as to Cook's claim for intentional infliction of emotional distress. Pierce claims that Cook is time-barred from asserting his claim for intentional infliction of emotional distress because the one-year statute of limitations expired no later than February 1, 2002, and Cook did not file this action until December 23, 2002. Miss. Code Ann. § 15-1-35 (Rev. 2002); *Slanton v. Hansford*, 830 So. 2d 686, 689 (Miss. 2002).

¶21.    However, Cook argues that the intentional infliction of emotional distress was a continuing tort. As a continuing tort, the statute of limitations does not begin to run until the date of the last injury. *Smith v. Sneed*, 638 So. 2d 1252, 1255 (Miss. 1994). Cook claims the date of the last injury was the day that the divorce decree was entered on June 3, 2002; therefore, according to Cook, his claim is timely, since he filed suit on December 23, 2002, well within the applicable one-year statute of limitations.

¶22.    To adequately address this issue, we briefly outline here the pertinent procedural history:

| Event: | Date: |
|---|---|
| Cook and Kathleen ceased marital cohabitation | 09-01-2000 |
| Affair between Pierce and Kathleen started | 09-30-2000 |
| Divorce filed | 10-2000 |
| Pierce's deposition | 01-29-2001 |
| Kathleen's deposition | 02-15-2001 |
| Divorce decree entered | 06-03-2002 |
| Complaint filed | 12-23-2002 |

¶23. Pierce asserts that both he and Kathleen admitted under oath in their sworn depositions which took place January 29, 2001, and February 15, 2001, respectively, that they had been having an adulterous affair. Pierce admittedly does not expressly state that he had sexual relations with Kathleen, but instead Pierce pleaded the Fifth Amendment. On the other hand, Kathleen openly admitted in her deposition that she and Pierce had sexual relations beginning in September 2000, and the record clearly reveals that Cook was present at the time of Kathleen's deposition. Therefore, Pierce claims that, even giving Cook the benefit of the doubt, the latest possible time the statute of limitations could have begun to run on Cook's claim for intentional infliction of emotional distress was February 15, 2001. Pierce thus claims that the statute of limitations ran on February 15, 2002, and that, as a result, Cook's complaint, filed on December 23, 2002, was not timely. Therefore, he says, the trial court should have granted his motion for partial directed verdict on this issue.

¶24. Conversely, Cook argues that the date of the divorce decree was the date of the last injury; thus, the statute of limitations did not begin to run until June 3, 2002. According to Cook, since he filed suit on December 23, 2002, his lawsuit was timely filed under the applicable statute of limitations.

9

¶25.    We previously have defined the continuing tort doctrine as follows:

[W]here a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury, or when the tortious acts cease. Where the tortious act has been completed, or the tortious acts have ceased, the period of limitations will not be extended on the ground of a continuing wrong.

A "continuing tort" is one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. *A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation.*

*Stevens v. Lake*, 615 So. 2d 1177, 1183 (Miss. 1993) (emphasis in original) (quoting C.J.S. Limitations of Actions § 177 at 230-31) (1987)). A few years after *Stevens*, we again addressed the continuing tort doctrine in *Smith v. Franklin Custodian Funds, Inc.*, 726 So. 2d 144 (Miss. 1998). Addressing our decision in *Stevens*, we stated:

Indeed, we opined that continuing or repeated injuries can give rise to liability even if they persist outside the time period for the initial injury, but we noted that the defendant must commit repeated acts of wrongful conduct. *Stevens*, 615 So. 2d at 1183 (citing *Hendrix v. City of Yazoo City*, 911 F.2d 1102 (5th Cir. 1990)). We have held that we will not apply the continuing tort doctrine when harm reverberates from one wrongful act or omission. *Id*.

*Smith,* 726 So. 2d at 148-49 (Miss. 1998).

¶26.    Returning to today's case, Cook testified to several wrongful acts by Pierce that occurred until the divorce which constituted repeated wrongful conduct, causing Cook emotional distress. Not only did Pierce take Kathleen on a trip to New Orleans during which they had sexual relations, but Pierce flaunted his involvement with Kathleen in front of Cook at a local restaurant in Jackson. Furthermore, there is tape-recorded evidence in which

10

Pierce's voice is in the background clearly "coaching" Kathleen concerning what to say to Cook. Pierce himself called Cook on his birthday, allegedly apologizing for the situation with Kathleen. Based on this evidence, the Court finds there was repeated wrongful contact by Pierce. We thus find that the trial court did not err in tolling the statute of limitations until the date of the divorce decree. Therefore, Cook's claim for intentional infliction of emotional distress was filed within the applicable one-year statute of limitations. For these reasons, we find this issue also to be without merit.

## II. WHETHER THE LOWER COURT ERRED IN DENYING PIERCE'S MOTION FOR JNOV OR, ALTERNATIVELY, A NEW TRIAL.

¶27. Once the trial court denied Pierce's motion for a partial directed verdict, Pierce presented his case-in-chief. At the close of the presentation of the evidence, the reading of the instructions to the jury, and closing arguments of counsel for the parties, the jurors retired for deliberations, taking with them the written jury instructions, the exhibits offered and received into evidence, and their independent recall of the witnesses' testimony. In due course, the jury returned a verdict in favor of Cook and against Pierce, assessing damages in the total amount of $1,500,000. The trial court subsequently denied Pierce's post-verdict motion for a judgment notwithstanding the verdict or, alternatively, for a new trial. We now consider the trial court's action via Pierce's assignment of error.

### A. JNOV

¶28. As Pierce's motion for JNOV is a repetition of his motion for partial directed verdict, we see no reason to discuss this issue further, finding that, for the same reasons set out in our

11

discussion of Issue I.A., *supra*, the jury's verdict is beyond our authority to disturb.[1]  Thus, this issue is without merit.

### B.  A New Trial

¶29.    In his motion for a new trial, Pierce asserts that the trial court committed prejudicial error in ruling on numerous evidentiary matters concerning Cook's claim of alienation of affection.  Moreover, Pierce asserts that Cook's counsel made statements in front of the jury which unduly prejudiced the jury and which should have entitled Pierce to a mistrial.  Thus, Pierce claims that the trial court's final judgment entered consistent with the jury verdict should be set aside as to Cook's claim of alienation of affection, and Pierce should be granted a new trial on that claim.

¶30.    This Court's standard of review of a denial of a post-trial motion for a new trial is abuse of discretion.  ***White***, 932 So. 2d at 33 (citing ***White v. Yellow Freight System, Inc.***, 905 So. 2d 506, 510-11 (Miss. 2004)).  *See also* ***Green v. Grant***, 641 So. 2d 1203, 1207 (Miss. 1994).

¶31.    This Court's standard of review when considering a trial judge's admission or exclusion of evidence is likewise one of abuse of discretion.  ***Whitten v. Cox***, 799 So. 2d 1, 13 (Miss. 2000).  "Where error involves the admission or exclusion of evidence, this Court 'will not reverse unless the error adversely affects a substantial right of a party.'" ***Id.*** (quoting

---

[1]The *de novo* standard of review is applicable regarding appellate review of a trial court's grant or denial of a directed verdict, a peremptory instruction, or a judgment notwithstanding the verdict.  ***White***, 932 So. 2d at 32.

*Floyd v. City of Crystal Springs*, 749 So. 2d 110, 113 (Miss. 1999)). *See also **In re Estate of Mask***, 703 So. 2d 852, 859 (Miss. 1997); ***Terrain Enters., Inc. v. Mockbee***, 654 So. 2d 1122, 1131 (Miss. 1995).

¶32.   Thus, to support his argument for a new trial, Pierce asserts the trial court committed four errors which cumulatively deprived him of a fair trial: (1) the trial court refused to allow Pierce to offer evidence relating to Cook's move to California; (2) the trial court prohibited Pierce from putting on evidence relating to the "rate of return on investment" presented by Cook's accountant-expert; (3) the trial court refused to allow Pierce to offer testimony relating to a tape-recorded message from Pierce to Cook; and (4) the trial court prohibited Pierce from questioning Cook about the title to the marital home.  Furthermore, Pierce asserts that while each error committed by the trial court may be harmless in and of itself, the cumulative effect of these errors deprived Pierce of a fair trial.

### 1.   Cook's move to California

¶33.   Pierce contends that Cook presented evidence that he is no longer able to see his children as a result of Pierce; however, Pierce was prohibited from cross-examining Cook about the fact that he chose to move to California.  Pierce asserts that he was not allowed to question Cook as to why he visits his children only three times a year; why Cook almost always returns the children early; or why Cook sold his home in Madison to move to California.  Pierce cites ***Bland v. Hill***, 735 So. 2d 414, 419 (Miss. 1999), for the proposition that this Court has held that in alienation-of-affection cases, the defendant must show that the alienation was caused by other factors, even the plaintiff's own conduct.  Based on

13

***Bland***, Pierce contends that he should have been allowed to show the jury Cook's own actions and/or inactions with regard to parenting his children. Pierce avers that because he was prohibited from showing Cook's own actions and/or inactions, he was deprived of a fair trial and was unduly prejudiced.

¶34. On the other hand, Cook argues that Pierce has mischaracterized the trial court's rulings. Pierce was given wide latitude to question Cook about his relationship with his children ***before*** the adulterous affair between Pierce and Kathleen. However, Pierce also attempted to question Cook regarding his relationship with his children ***after*** the adulterous affair, on such matters as how Cook's sale of his Madison home and his move to California affected his relationship with his children.

¶35. We agree with Pierce that this Court has held that defendants in alienation cases must be allowed to attempt to prove that they were not the cause of the plaintiff's divorce, but Pierce was given ample opportunity to cross-examine Cook about his marriage with Kathleen. ***Bland***, 735 So. 2d at 419. Additionally, Pierce was permitted to cross-examine Cook as to his relationship with the children ***before*** the adulterous affair. In fact, Pierce was permitted to question Cook as to his relationship with his children even after the divorce. During Pierce's cross-examination of Cook, the following occurred:

Q. Well, since January of 2006, how many times have you been back to Mississippi to visit your three children?

[ATTORNEY FOR COOK]:     Object to relevance.

THE COURT:     Overruled.

14

A.   I believe twice.

Q.   And when were those two times, since January of this year?

A.   One was in February for Ernie's birthday around the 14th; and I believe the other time was sometime in March, I want to say.

Q.   Now, you have the right under the property settlement and custody agreement to visit your children every other weekend.

[ATTORNEY FOR COOK]:   Your Honor, we're going to object to any testimony out of the judgment of divorce or the property settlement and object to the relevance as to when he has a right to visit his children.

THE COURT:      Sustained

MR. PIERCE:      Your Honor –

THE COURT:      The objection is sustained.

The testimony about which Pierce complains today was irrelevant to the matter at hand and was properly denied by the trial court inasmuch as this evidence concerned Cook's conduct long after the commencement of the adulterous affair between Pierce and Kathleen.

### 2. *Rate of Return on Investment*

¶36.   Next, Pierce complains that he was not able to establish the "rate of return on investments" because he was prohibited from discovering the total values of Cook's trust[2]

---

[2]There is little evidence in the record to aid us in learning about Cook's trust. We know from the record that Cook's accountant testified regarding his opinion as to the amount of interest income Cook lost on the money Cook withdrew from the trust "due to [Pierce's] conduct."  Pierce is of the opinion that he should have been allowed to cross-examine Cook's accountant concerning "the total value of the trust before his involvement with Mr. Cook's wife and at the time of trial."  The only other evidence we know from the record is that Cook's trust fund was established for him by his late father and Cook withdrew

before and after the divorce. During direct examination, Raleigh Cutrer, Cook's expert accountant, testified to the "rate of return" as follows:

Q.   . . . Now, as a result of having to pull money out of the trust, I don't believe you've factored in any of the loss that he would receive in loss of interest. Is that correct?

A.   That is correct.

Q.   And is there any way for you to give me an approximate, or have you been able to calculate a value, or an amount for the loss of income that he suffered as a result of having to pull out all of these funds from the trust account?

A.   Yes. What we looked at is that from the year – we looked at his trust fund account and his personal account. He has a personal account at the brokerage house. And we looked at both of them or one that account grew to from 2000 to 2004. And roughly - - and realizing that period was probably one of the worst periods from an investment standpoint you could really probably look at, excluding 2004, it still grew a total of about thirteen percent. Not thirteen percent a year, but a total of thirteen percent. So if you extrapolate that to $500,000, that would add an additional 65,000 roughly of value to the 500,000.

Q.   All right. So another 65,000 that he lost as a result of having to withdraw these funds.

A.   Right. That's just the 2004. If you look at 2005, where the yield was much better, probably somewhere in the neighborhood of almost close to ten percent growth; you know, that would increase that amount probably another $50,000 or so.

Q.   Another 50?

A.   Fifty.

---

approximately $4,000 a month for expenses from his trust fund while married to Kathleen.

16

Q.    So from 65,000 to 115,000?

A.    Yes. . . .

On cross-examination, Pierce attempted to question Cutrer as to the amounts held in trust before and after the divorce.  This testimony was sustained by the trial court.  Specifically, Pierce asked:

Q.    What is the value of each of those trusts?

[ATTORNEY FOR COOK]:  Object to relevance, Your Honor.

THE COURT:    Sustained.

Q.    What's Mr. Cook's total net worth?

[ATTORNEY FOR COOK]: Objection to relevance, Your Honor.

THE COURT:    Sustained.

[ATTORNEY FOR PIERCE]:  Your Honor, they've already opened the door with asking and so forth the percentage - - so far as asking the percentage of increase over the value of his assets. They have asked the question numerous times about how much the trust was worth before this money was withdrawn and now how much it is worth afterward.  I ought to be able to inquire as to, one, what the value was at the date of marriage, what the date of the - - well, date of establishment, date of marriage and date other further benchmarks along the way.

[ATTORNEY FOR COOK]: Your Honor, may I be heard?

THE COURT:    Put the jury in the jury room.

(THE JURY DEPARTED TO THE JURY ROOM)

THE COURT:    I hadn't heard anything about the value of that trust brought out on direct.

17

[ATTORNEY FOR PIERCE]: Your Honor, they were talking about - - I don't know which card it was here - - but they were talking about how - - the witness testified how much the trust had gained in value and had lost in value - - I mean, lost perspective value by the fact that the money was taken out.

THE COURT: No. What they asked was: based on what was taken out.

[ATTORNEY FOR COOK]: By those - -

THE COURT: How much was lost because of the amount that was taken out, not the interest on the entire trust.

[ATTORNEY FOR PIERCE]: Well, Your Honor, he used as a barometer to gauge and determine this fact the percentage return of investment, if I'm not mistaken, of the trust.

THE COURT: Yeah.

[ATTORNEY FOR PIERCE]: And I believe one of the trusts he had not taken something out of was used as a barometer. I may - - the witness may be able to better answer that; but they determined that there was a percentage growth by which they backed into this, is the way I understood it.

THE COURT: Well, the money that was - - this money that was taken out of that trust would have earned that same amount, and that's why he used that barometer.

[ATTORNEY FOR PIERCE]: Well, I know, Your Honor. That's why I want to go back and find out what was the base amount from which he calculated it.

[ATTORNEY FOR COOK]: But there's - -

THE COURT: Well, it - -

[ATTORNEY FOR COOK]: It's irrelevant.

18

THE COURT: It does not matter. He's testified that's how he did it. It doesn't matter how much money was in that trust; the way I see it. I don't see how you could look at it any other way. I mean, it doesn't matter if it's worth 100 million dollars or $10,000. He testified as to what the loss was on what was drawn out of it. And the best barometer he could use was what the trust earned. Because you couldn't go get somebody else's trust and say, "Well, that one earned twenty-eight percent or five percent, so that's what this one would be." He used the best barometer he could use. So it doesn't matter how much is in there. He's showing his loss.

Based on Cutrer's testimony, the trial court determined that it was not necessary for Pierce to cross-examination Cutrer on the actual money in the trust. Cutrer based the "rate of return" of the money withdrawn on the trust account according to the actual "rate of return" Cook received on the trust. Therefore, from the record before us, we find that the trial court did not err in sustaining as irrelevant testimony pertaining to the actual amount of the trust.

### 3. Tape Recording

¶37. Third, Pierce contends that the trial court refused to allow Pierce to testify concerning the comments he made about Cook's stepfather in a phone message[3] Pierce left on Cook's birthday. Pierce claims that while he admittedly referred to Cook's father during the

---

[3]Although the telephone with digital message was received into evidence as exhibit P-12, such evidence was not provided with the record for appellate review. According to Cook, Pierce phoned Cook on his birthday and wanted to talk with Cook. Pierce also invited Cook to bring his "father."

message, he was really speaking of Cook's stepfather.  Additionally, Pierce claims that he was prohibited from questioning Dorothy Sprayberry, Cook's mother, as to whether it would be unusual for someone to refer to her husband as Cook's father.  A reference to Pierce's testimony reveals that Pierce's contention lacks merit.

Q.  Okay.  Now, they – early on – it's been a long week – I think it was the first thing Tuesday, they played a tape where you mentioned something about Mr. Cook's father, who we have now learned was deceased.  Were you referring to his deceased father or were you referring to another individual?

A.  I was not referring to his deceased father.

Q.  And who were you referring to?

A.  As his mother testified yesterday, she has remarried.  She's been remarried since he was in college, or just got out of college.  And the man she was remarried to, Frank, has been in Mr. Cook's life – virtually, I think, his entire life.  Because he – now, he's his stepfather.

[ATTORNEY FOR COOK]:  Objection, Your Honor.  We already discussed this yesterday.

[ATTORNEY FOR PIERCE]: Your Honor, he's –

The Court: He can testify that he's his stepfather.

[ATTORNEY FOR COOK]: I have no problem with that.

A.  But he used to – he's been in his life longer than that; because he used to be his uncle.

[ATTORNEY FOR COOK]: Your Honor –

The Court: Mr. Lingle.

[ATTORNEY FOR PIERCE]: Yes, sir;

[ATTORNEY FOR PIERCE]: May I continue, Your Honor?

20

The Court: Yes, sir.

Q: Mr. Pierce, it's suffice to say, that you didn't mean his deceased father, you meant his stepfather. Is that correct?

A. Absolutely.

¶38. Thus, because Pierce was allowed to testify that he was referring to Cook's stepfather and not Cook's deceased father, the trial court did not abuse its discretion in prohibiting Pierce's counsel to question Sprayberry about whether it would be unusual for someone to refer to her current husband as Cook's father.

### 4. *Marital Home*

¶39. Lastly, Pierce asserts the trial court erred in prohibiting him from cross-examining Cook as to why the marital home of Cook and Kathleen was titled in the name of Cook's trust instead of in the names of Cook and Kathleen as individuals. Pierce contends that he should have been allowed to show the jury that Cook's total and complete financial control of Kathleen was the reason she chose to divorce him, not because of Pierce's conduct. *Bland*, 735 So. 2d at 418-19.

¶40. On the other hand, Cook admits that Pierce had the right to prove that he did not cause the subject divorce, but Cook asserts that the trial court has the ultimate determination as to the admissibility of evidence and its relevance. As explained *supra*, the standard of review governing the admissibility of evidence is whether the trial court abused its discretion. *Whitten*, 799 So. 2d at 13. We find no abuse of discretion on the part of the trial judge in prohibiting Pierce from questioning Cook about the title to the marital home.

### III. WHETHER THE LOWER COURT ERRED IN GRANTING JURY INSTRUCTION NO. 10.

¶41. Recently, we addressed this Court's familiar standard of review when considering challenges to jury instructions. "When we review a claim of trial court error in granting or denying jury instructions, we are required to read and consider all of the jury instructions together as a whole." *Richardson v. Norfolk S. Ry. Co.*, 923 So. 2d 1002, 1010 (Miss. 2006) (citing *Burr v. Miss. Baptist Med. Ctr.*, 909 So. 2d 721, 726 (Miss. 2005)). "No instruction should be taken out of context or read alone in isolation." *Richardson*, 923 So. 2d at 1010.

¶42. Pierce argues that jury instruction No. 10 essentially allowed the Rules of Professional Conduct to be used in a civil trial without the need of expert testimony to explain them as required by this Court. Jury Instruction No. 10 states:

> The Court instructs the Jury that a lawyer owes his clients duties falling into three broad categories, duty of care, duty of loyalty and duties provided by contract.

As such, Pierce contends this jury instruction should not have been given in light of our Rules of Professional Conduct. In the introductory portion of the Rules we find this language:

> Violation of a Rule of Professional Conduct does not give rise to a cause of action nor does it create a presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules

22

should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.

Mississippi Rules of Professional Conduct, Scope. Moreover, Pierce cites ***Wilbourn v. Stennett, Wilkinson & Ward***, 687 So. 2d 1205, 1216 (Miss. 1997) for the contention:

> [T]he purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rules. Accordingly, nothing in the rules should be deemed to augment any substantive legal duties of lawyers or the extra-disciplinary consequences of violating such a duty.

(citing ***Singleton v. Stegall***, 580 So. 2d 1242, 1244-45 (Miss. 1991)).

¶43. Conversely, Cook counters that the Court has "ask[ed] only that the instructions, read collectively, fairly inform the jury 'on the elements necessary to establish liability.'" ***Flight Line, Inc. v. Tanksley***, 6085 So. 2d 1149, 1157 (Miss. 1992) (quoting ***Strickland v. Rossini***, 589 So. 2d 1268, 1275 (Miss. 1991)). This Court agrees that a review of all of the instructions, taken together, leads us to the conclusion that the instructions fully informed the jury as to the necessary elements of proof concerning Cook's claims. Particularly, Jury Instruction No. 7 states:

> The Court instructs the jury that the tort of alienation of affection is comprised of three elements.

> The elements of the tort of alienation of affections are as follows:

> 1. wrongful conduct of the Defendant;
> 2. loss of affection or consortium and
> 3. causal connection between the conduct and loss.

23

If Ernest Alan (sic) Cook Sr. proved the above three elements of the tort of alienation of affections by a preponderance of the evidence, then you must return a verdict for the Plaintiff Ernest Alan (sic) Cook Sr. on his claim for alienation of affections.

If Ernest Alan (sic) Cook Sr. has failed to prove any one or more of the above listed elements, then you must return a verdict for the Defendant.

Therefore, the jury was informed on the elements necessary to prove a claim for alienation of affection. Jury Instruction No. 9 states:

You are instructed that in order to establish a case of intentional infliction of emotional distress against Ronald Henry Pierce, Ernest Alan (sic) Cook Sr. must prove by a preponderance of the evidence the following elements:

1. Ronald Henry Pierce committed an act without justification or reason;
2. The act is one which evokes outrage or revulsion in civilized society;
3. The act was directed at or intended to cause harm to Ernest Alan (sic) Cook Sr.; and
4. Any resulting emotional distress was foreseeable from this intentional act.

You are instructed that if you find that Ernest Alan (sic) Cook Sr. has proven the four elements above by a preponderance of the evidence, then you must return a verdict in favor of Ernest Alan (sic) Cook Sr. on his claim for intentional infliction of emotional distress.

If Ernest Alan (sic) Cook, Sr., has failed to prove any one or more of the above listed elements, then you must return a verdict for the Defendant.

Jury Instruction No. 9 informed the jury of the elements necessary for intentional infliction of emotional distress. Furthermore, Jury Instructions No. 5 and 6 should be considered. Jury Instruction No. 5:

24

The Court instructs you that if you find from the preponderance of the evidence that Ronald Henry Pierce committed adultery with Ernest Alan (sic) Cook Sr.'s wife then the Court instructs you that malice is presumed.

Jury Instruction No. 6:

The Court instructs the jury that the Plaintiff was entitled to be protected in his marital relationship without interference from Defendant.

The interest protected is personal to the Husband and arises out of the marriage relation, and includes the society, companionship, love, affection, aid, services, support, sexual relations and the comfort of his wife as special rights and duties growing out of the marriage covenant.

¶44. In addition, Jury Instruction No. 10, objected to by Pierce, is a correct statement of the legal duties owed by an attorney to a client and was set forth as law by this Court in *Singleton*, 580 So. 2d at 1244.

¶45. In sum, the jury instructions in today's case, when read as a whole, clearly and properly informed the jury of the law which the jury was to consider in arriving at the appropriate verdict in this case. From the record before the Court, we find no error, much less reversible error, in the trial court's giving of Jury Instruction No. 10, when this instruction is read along with all the other jury instructions which were given.

¶46. This issue is without merit.

## CONCLUSION

¶47. For the reasons stated, the Rankin County Circuit Court judgment entered consistent with the jury verdict against Ronald Henry Pierce and in favor of Ernest Allan Cook, Sr., in the total amount of $1,500,000, is affirmed.

¶48. **AFFIRMED.**

25

**SMITH, C.J., WALLER, P.J., DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. DIAZ, P.J., AND EASLEY, J., DISSENT WITHOUT SEPARATE WRITTEN OPINION.**